COLUMBIA PROPANE, L.P., a Limited Partnership,
Plaintiff-Appellant,

v.

WISCONSIN GAS COMPANY, a Wisconsin Corporation,
Defendant-Respondent-Petitioner,

ABC INSURANCE Co., a corporation or other entity,
and DEF Insurance Co., a corporation or other
entity, Defendants.

Supreme Court

*No. 01–0090. Oral argument January 15, 2003.—Decided
May 13, 2003.*

2003 WI 38

(Also reported in 661 N.W.2d 776.)

73

For the defendant-respondent-petitioner there were briefs by *O. Thomas Armstrong, John A. Casey* and *Quarles & Brady LLP,* Milwaukee, and oral argument by *O. Thomas Armstrong* and *John A. Casey.*

For the plaintiff-appellant there was a brief by *Michael Ash, Michael B. Apfeld, John L. Clancy* and *Godfrey & Kahn, S.C.,* Milwaukee, and *Gerald M. O'Brien* and *Anderson, Shannon, O'Brien, Rice & Bertz,* Stevens Point, and oral argument by *Michael B. Apfeld.*

An amicus curiae brief was filed by *Charles P. Graupner, Pamela L. Gergens* and *Michael Best & Friedrich LLP,* Milwaukee, on behalf of Wisconsin Manufacturers and Commerce and the Metropolitan Milwaukee Association of Commerce.

¶ 1. WILLIAM A. BABLITCH, J. At issue in this case is whether a company that acquires the assets of another company via an asset purchase agreement is liable for the liabilities of the selling company which are unknown to either party at the time they enter into the agreement.

¶ 2. The petitioner, Wisconsin Gas Company (Wisconsin Gas) purchased the assets of the now defunct People's Gas Company (People's Gas), primarily consisting of a tract of real property. Wisconsin Gas subsequently sold the property to Columbia Propane, L.P. (Columbia Propane). About 30 years later, environmental contamination was discovered on the property, which had been caused by the gas manufacturing operations of People's Gas. The State of Wisconsin brought an action against Columbia Propane for this environmental contamination. Columbia Propane then brought an action against Wisconsin Gas, claiming that Wisconsin Gas was liable for the environmental contamination because it had assumed all the liabilities of People's Gas when it purchased its assets.

¶ 3. The Circuit Court for Wood County, Judge Dennis D. Conway presiding, found in favor of Wisconsin Gas and granted their motion for summary judgment. The court of appeals reversed, concluding that the language in the asset purchase agreement between People's Gas and Wisconsin Gas was ambiguous regarding whether Wisconsin Gas agreed to assume unknown tort liabilities.[1] Based on (1) the general rule of nonliability for purchasing corporations in the context of asset purchase agreements; (2) the express language in the asset purchase agreement between Wisconsin Gas and People's Gas; and (3) the common interpretation and use of asset purchase agreements in the business community, we conclude that Wisconsin Gas did not assume liabilities of People's Gas that were unknown to either party at the time they entered into the asset purchase agreement. Accordingly, we reverse the deci-

---

[1] *Columbia Propane, L.P. v. Wisconsin Gas Co.,* 2002 WI App 9, 250 Wis. 2d 582, 640 N.W.2d 819.

sion of the court of appeals and hold that the circuit court properly granted summary judgment in favor of Wisconsin Gas.

## I. FACTS AND PROCEDURAL HISTORY

¶ 4. The now defunct People's Gas owned approximately 1.4 acres of real estate in Marshfield, Wisconsin consisting of two parcels: a southern parcel and a northern parcel. From approximately 1929 to 1959, People's Gas operated a coal gas plant on the southern parcel. In 1959, Wisconsin Gas[2] and People's Gas began negotiations regarding the sale of the southern parcel. On November 12, 1959, Wisconsin Gas and People's Gas signed an "Agreement Between Milwaukee Gas Light Company [Wisconsin Gas] And The Stockholders Of People's Gas Company" (Stock Agreement), in which the stockholders of People's Gas agreed to sell, and Wisconsin Gas agreed to buy, all of the outstanding capital stock on the date of a specified closing.

¶ 5. The next day, on November 13, 1959, Wisconsin Gas filed an application with the Wisconsin Public Service Commission (PSC) seeking approval to acquire the assets of People's Gas by purchasing the outstanding shares of capital stock of People's Gas in accordance with the Stock Agreement and merging People's Gas into Wisconsin Gas in accordance with Wis. Stat. § 196.80(1)(c) (1959–60).[3] On December 4, 1959, the

---

[2] At this time, Wisconsin Gas was known as "Milwaukee Gas Light Company;" however, we will refer to the company as "Wisconsin Gas."

[3] Wis. Stat. § 196.80(1)(c) (1959–1960) provided:

Any public utility owning all the stock of any other public utility may file in the office of the secretary of state a certificate of such ownership, in its name and under its corporate seal, signed by

PSC held a hearing on Wisconsin Gas's application for a stock purchase and merger. On December 22, 1959, Wisconsin Gas wrote a letter to the PSC informing it that it was revising the proposed form of the acquisition from a stock purchase to an asset purchase.[4] Two days later, the legal counsel for People's Gas wrote a letter to the PSC stating that People's Gas accepted the proposed

its president or a vice president and its secretary or treasurer, and setting forth a copy of the resolution of its board of directors to merge such other corporation and to assume all of its obligations, and the date of the adoption of such resolution. Thereupon all of the estate, property rights, privileges and franchises of such other corporation shall vest in and be held and enjoyed by such possessor corporation as fully and entirely and without change or diminution as the same were before held and enjoyed by such other corporation, and be managed and controlled by such possessor corporation, but subject to all liabilities and obligations of such other corporation and the rights of all creditors thereof. The possessor corporation shall be deemed to have assumed all the liabilities and obligations of the merged corporation, and shall be liable in the same manner as if it had itself incurred such liabilities and obligations. The possessor corporation may relinquish its corporate name and assume in place thereof the name of the merged corporation by including a provision to that effect in the resolution of merger adopted by the board of directors and set forth in the certificates of ownership and upon the filing of such certificate the change of name shall be complete.

[4] The letter from Wisconsin Gas to the PSC stated in part:

At the time we filed our application in this docket and at the time the hearing was held it was contemplated that Milwaukee Gas Light Company [Wisconsin Gas] would acquire the assets of People's Gas Company through purchase of the stock of that Company and the immediate merger thereof into Milwaukee Gas Light Company [Wisconsin Gas]. It now appears that it will be advisable to revise the proposed form of the acquisition so as to eliminate the step involving purchase of stock and to provide for acquisition of such assets directly by Milwaukee Gas Light Company [Wisconsin Gas] from either People's Gas Company or from the stockholders of People's Gas Company after liquidation of such Company. Except for such change in form, it is contemplated that

change in form from a stock purchase and merger to an asset purchase.[5] On January 5, 1960, Wisconsin Gas and People's Gas signed an asset purchase agreement (1960 Agreement), whereby Wisconsin Gas would purchase the assets of People's Gas. The 1960 Agreement between Wisconsin Gas and People's Gas provided in relevant part:

> [T]he parties now desire to cancel the aforesaid agreement dated November 12, 1959, and to supersede the same with this Agreement in order to revise the form of

the price and other terms and the ultimate effect of the transaction would be the same as originally contemplated and as presented to the Commission.

In view of this change in the form of the transaction, we hereby respectfully request that the Commission give its approval and consent to the consummation of such acquisition of assets by purchase thereof either directly from People's Gas Company or from its stockholders.

[5] The letter from People's Gas to the PSC stated in part:

At the time the application was filed in the above-entitled matter with your Commission and also at the time of the hearing of such application, it was contemplated that Milwaukee Gas Light Company [Wisconsin Gas] would acquire the assets of Peoples Gas Company by purchasing the common stock of Peoples Gas Company.

Representatives of Milwaukee Gas Light Company [Wisconsin Gas] have now concluded that it would be advisable to revise the proposed form of acquisition of the Peoples Gas Company assets by arranging for the purchase of the assets themselves and the assumption of the payment of all liabilities rather than the acquisition of these assets through the purchase of all of the capital stock of Peoples Gas Company. On behalf of all of the stockholders of Peoples Gas Company . . . I wish to take this means of advising you that the change in the manner of acquisition of the assets of Peoples Gas Company as proposed by Milwaukee Gas Light Company [Wisconsin Gas] is acceptable to Peoples Gas Company and its stockholders and they request that an Order be issued by your Commission authoring this purchase and sale.

such transaction so as to provide that Milwaukee [Wisconsin Gas] shall acquire all of the assets, franchises and business of People's Gas through purchase thereof directly from People's Gas in consideration for cash and the assumption by Milwaukee [Wisconsin Gas] of the liabilities and obligations of People's Gas, *subject to the provisions of this Agreement;*

NOW, THEREFORE, in consideration of the mutual promises of the parties herein set forth, the parties do hereby agree with each other as follows:

1. (a) People's Gas hereby agrees to sell to Milwaukee [Wisconsin Gas], at the date of closing hereunder, subject to the terms and conditions of this Agreement, all of the assets, franchises and business as a going concern which immediately prior to closing shall have been owned and operated by People's Gas (the "Assets"). . . . Such sale, conveyance, transfer and delivery shall be made *free and clear of any liability, obligation,* imperfection of title, lien or encumbrance *except only* those referred to in paragraph 4(d) hereof and those *liabilities and obligations which are to be assumed by Milwaukee* [Wisconsin Gas] at the closing as hereinafter provided, and People's Gas agrees to indemnify and save Milwaukee [Wisconsin Gas] harmless with respect to any liability of People's Gas which is not assumed by Milwaukee hereunder.

(b) Milwaukee [Wisconsin Gas] hereby agrees, subject to the terms and conditions of this Agreement and in reliance on the representations and warranties herein contained of People's Gas, to purchase the Assets from People's Gas at the date of closing as aforesaid and to assume all of the *then outstanding* debts, obligations, contracts and liabilities of People's Gas, provided, that Milwaukee [Wisconsin Gas] shall have no liability with respect to the following: (ii) any obligations or liabilities incurred by People's Gas after the closing . . .

80

. . . .

4. As an inducement to Milwaukee [Wisconsin Gas] to purchase the Assets, People's Gas makes the following representations and warranties, and covenants that they shall be true at the time of closing:

. . . .

(c) The balance sheet as of September 30, 1959, Exhibit A hereto, has been prepared in accordance with generally accepted accounting practices; it correctly reflects the Assets, liabilities and financial status of People's Gas as of said date; *People's Gas has no liabilities of any nature, whether accrued, absolute, contingent or otherwise,* and whether for taxes, contract or tort claims or otherwise, for which adequate provision has not been made in Exhibit A or by insurance . . . There are no actions, suits or proceedings pending or threatened against or affecting People's Gas which are not fully covered by insurance of which would materially adversely affect the financial position or Assets or operations of People's Gas.

(Emphasis added.) Two days later, on January 7, 1960, the PSC issued its Findings of Fact, Opinion, and Order, which approved the asset purchase agreement between Wisconsin Gas and People's Gas and the transaction closed on February 1, 1960.

¶ 6. In 1962, Columbia Propane[6] purchased the southern parcel from Wisconsin Gas. Four years prior, in 1958, Columbia Propane had purchased the northern parcel from People's Bottled Gas Company.[7] Conse-

---

[6] At this time, Columbia Propane was known as "National Propane, L.P.;" however we will refer to the company as "Columbia Propane."

[7] People's Bottled Gas is a now defunct Wisconsin corporation that was related by common ownership to People's Gas.

quently, Columbia Propane has been the owner of the entire parcel of real estate since 1962. Subsequently, the State of Wisconsin brought an action against Columbia Propane for environmental contamination that had been caused by People's Gas, which had been discovered on the southern parcel and allegedly migrated to the northern parcel and possibly off the site.

¶ 7. Columbia Propane commenced this action against Wisconsin Gas in August 1999, alleging that based on the 1960 Agreement, Wisconsin Gas had assumed the liabilities and obligations of People's Gas for the environmental contamination. Wisconsin Gas moved for summary judgment, arguing that it had assumed only certain liabilities that were "then outstanding," which did not include unknown liabilities. Columbia Propane moved for partial summary judgment, asserting that Wisconsin Gas's motion for summary judgment should be denied and that Columbia Propane should be awarded partial summary on the successor liability issue. Columbia Propane argued that the language in the 1960 Agreement clearly demonstrated that Wisconsin Gas intended to assume the obligations and liabilities at issue in this case, especially when read in light of Wisconsin Gas's representations to the PSC. Alternatively, Columbia Propane argued that even if Wisconsin Gas did not assume all the liabilities and obligations of People's Gas, then it fraudulently entered into the transaction to escape these liabilities.

¶ 8. The circuit court granted Wisconsin Gas's motion for summary judgment, finding that Wisconsin Gas did not assume liability for the unknown environmental contamination when it entered into the 1960 Agreement. With respect to Columbia Propane's allegation of fraud, the circuit court noted that Columbia

Propane did not allege fraud in its complaint, but rather only brought it up in its brief for partial summary judgment. Since fraud had not been pled, the circuit court did not consider the claim. However, it did note that it would be "difficult to envision how Wisconsin Gas entered into the January, 1960 contract to fraudulently escape a liability which all parties agree was unknown to either of the parties to the contract in 1960." After Wisconsin Gas had prevailed on its motion for summary judgment, Columbia Propane moved to amend its complaint to include constructive fraud. The circuit court denied Columbia Propane's motion, reasoning that Columbia Propane could have brought the motion to amend its complaint earlier, but instead waited to see whether or not it would be successful in its motion for partial summary judgment. The circuit court concluded that it would be unfair to Wisconsin Gas to allow Columbia Propane to essentially resurrect the action on another theory after summary judgment had already been granted in favor of Wisconsin Gas.

¶ 9. The court of appeals reversed, with one judge dissenting. The court of appeals concluded that the language in the 1960 Agreement is ambiguous regarding whether Wisconsin Gas agreed to assume liability for unknown tort claims and that resolution of the ambiguity presents issues of fact, making summary judgment inappropriate. The court of appeals also remanded for reconsideration of whether Columbia Propane should be allowed to amend its complaint to add allegations of fraud since the circuit court had based its decision to deny Columbia Propane's motion on an erroneous view of Wisconsin Gas's entitlement to summary judgment. Judge Roggensack dissented, concluding that the 1960 Agreement was not ambiguous and

that Wisconsin Gas did not assume liability for the unknown environmental contamination caused by People's Gas.

¶ 10. Wisconsin Gas petitioned this court for review, which was accepted on March 22, 2002.

## II. STANDARDS OF REVIEW

■

¶ 11. A grant of summary judgment is reviewed using the same methodology as the circuit court. *Ahrens v. Town of Fulton,* 2002 WI 29, ¶ 15, 251 Wis. 2d 135, 641 N.W.2d 423. Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue to any material fact and that the moving party is entitled to judgment as a matter of law." Wis. Stat. § 802.08(2) (2001–02).[8]

■

¶ 12. The interpretation of a written contract is a question of law that this court reviews independently on appeal. *Jones v. Jenkins,* 88 Wis. 2d 712, 722, 277 N.W.2d 815 (1979). The construction of a contract is "essentially one of determining the intent of the parties." *In re Marriage of Levy v. Levy,* 130 Wis. 2d 523, 533–34, 388 N.W.2d 170 (1986). A term or provision in a contract is not ambiguous merely because it is general enough to encompass more than one interpretation; rather, we seek to ascertain its meaning by looking at the intent of the contracting parties. *Mattheis v. Heritage Mut. Ins. Co.,* 169 Wis. 2d 716, 722, 487 N.W.2d 52

---

[8] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

(Ct. App. 1992). In constructing a contract, "courts cannot insert what has been omitted or rewrite a contract made by the parties." *Levy,* 130 Wis. 2d at 533 (citing *Batavian Nat'l Bank of LaCrosse v. S&H, Inc.,* 3 Wis. 2d 565, 569, 89 N.W.2d 309 (1958)). Thus, contracts must be construed as they are written. *Amcast Indus. Corp. v. Affiliated FM Ins. Co.,* 221 Wis. 2d 145, 164, 584 N.W.2d 218 (Ct. App. 1998). In addition, a contract is to be interpreted in the manner that it would be understood by persons in the business to which the contract relates. *Matter of Liquidation of All-Star Ins.,* 112 Wis. 2d 329, 333, 332 N.W.2d 828 (Ct. App. 1983); *see also* 17A Am Jur 2d *Contracts* § 405 (1991) (a business contract must be construed in light of what a business person would reasonably expect to give or receive under its terms).

¶ 13. A circuit court's decision on whether to permit an amendment to a complaint later than six months after it has been filed is within the discretion of the circuit court. *Employees Local 1901 v. Brown County,* 146 Wis. 2d 728, 737, 432 N.W.2d 571 (1988). A circuit court properly exercises its discretion when it considers the relevant facts, applies the correct law, and articulates a reasonable basis for its decision. *In re Marriage of Krebs v. Krebs,* 148 Wis. 2d 51, 55, 435 N.W.2d 240 (1989). Therefore, this court will affirm a discretionary decision by a circuit court as long as the court did not erroneously exercise its discretion. *State v. Davis,* 2001 WI 136, ¶ 28, 248 Wis. 2d 986, 637 N.W.2d 62.

¶ 14. Applying these standards of review, we examine the primary issue of whether Wisconsin Gas assumed all the liabilities of People's Gas, including unknown and potentially unlimited tort liabilities, in

the asset purchase agreement it entered into with People's Gas. We also review the issue of whether the circuit court properly exercised its discretion in denying Columbia Propane's motion to amend its complaint to add constructive fraud.

## III. ANALYSIS

¶ 15. The general rule of successor liability in the context of asset purchase agreements is that a "corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation," subject to certain exceptions. *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir. 1977) (citations omitted).

¶ 16. The court in *Leannais* noted that non-liability is the "general rule in the majority of American jurisdictions . . . ." *Id. See, e.g., Moriarty v. SVEC*, 164 F.3d 323 (7th Cir. 1998); *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252 (1st Cir. 1997); *Kaiser Found. Health Plan v. Clary & Moore*, 123 F.3d 201 (4th Cir. 1997); *ARE Sikeston Ltd. P'ship v. Weslock Nat'l, Inc.*, 120 F.3d 820 (8th Cir. 1997); *Oppenheimer v. Prudential Secs. Inc.*, 94 F.3d 189 (5th Cir. 1996); *Seetransport Wiking Trader v. Navimpex Centrala Navala*, 989 F.2d 572 (2d Cir. 1993); *Raytech Corp. v. White*, 54 F.3d 187 (3rd Cir. 1995); *Kline v. Johns-Manville*, 745 F.2d 1217 (9th Cir. 1984); *R.J. Enstrom Corp. v. Interceptor Corp.*, 555 F.2d 277 (10th Cir. 1977); *Horphag Research Ltd. v. Consac Indus., Inc.*, 116 F.3d 1450 (Fed. Cir. 1997).

¶ 17. Wisconsin explicitly recognized this rule almost 20 years ago in *Fish v. Amsted Indus., Inc.*, 126 Wis. 2d 293, 298, 376 N.W.2d 820 (1985). Even one of the dissenters in *Fish* acknowledged that "[u]nder tra-

ditional corporate law a corporation purchasing the assets of another corporation is not liable for the debts and liabilities of the seller corporation." *Id.* at 314 (Abrahamson, J., dissenting).

¶ 18. There are four exceptions to this general rule:

> "(1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations."

*Id.* at 298 (quoting *Leannais,* 565 F.2d at 439).

¶ 19. Only the first exception is at issue in this case — namely, whether Wisconsin Gas expressly or impliedly agreed to assume liabilities of People's Gas that were unknown to the parties at the time they entered into the contract. In order to determine whether Wisconsin Gas assumed unknown tort liabilities of People's Gas, we review the relevant contract language in the 1960 Agreement. The 1960 Agreement provided, in part:

> Milwaukee [Wisconsin Gas] hereby agrees, subject to the terms and conditions of this Agreement and in reliance on the representations and warranties herein contained of People's Gas, to purchase the Assets from People's Gas at the date of closing as aforesaid and to assume all of the *then outstanding* debts, obligations, contracts and liabilities of People's Gas, provided, that Milwaukee [Wisconsin Gas] shall have no liability with respect to the following: (ii) any obligations or liabilities incurred by People's Gas after the closing . . . .

(Emphasis added.) Columbia Propane and Wisconsin Gas disagree as to the liabilities covered by the phrase "then outstanding." Columbia Propane argues that the language indicates that Wisconsin Gas assumed all pre-closing liabilities, including those that were unknown to the parties at the time they entered into the contract. In contrast, Wisconsin Gas claims that the language clearly illustrates that the parties' intention was that Wisconsin Gas assume only those liabilities that were then known to the parties prior to closing. We agree with Wisconsin Gas that based on the language in the 1960 Agreement, Wisconsin Gas did not assume unknown and potentially unlimited tort liabilities.

¶ 20. The first exception under *Fish* requires an express or implied *assumption* of liabilities, not an express exclusion of liabilities. *Fish,* 126 Wis. 2d at 298. In this case, Wisconsin Gas only assumed certain liabilities, including those that were "then outstanding" prior to closing. Consistent with the general rule that a purchasing corporation is not liable for the obligations and liabilities of the selling corporation, Wisconsin Gas agreed to purchase the assets of People's Gas "free and clear of any liability, obligation, imperfection of title, lien or encumbrance except only those referred to in paragraph 4(d) . . . and those liabilities and obligations which are to be assumed by Milwaukee [Wisconsin Gas] at the closing."

¶ 21. Throughout the 1960 Agreement, it is clear that Wisconsin Gas assumed only certain liabilities, including those that were "then outstanding." We agree with Wisconsin Gas that the phrase "then outstanding" includes only liabilities that were *known* to the parties at the time they entered into the 1960 Agreement.

88

First, the phrase itself, "then outstanding," indicates that the liabilities referred to were known at the time the parties contracted. Indeed, it would be an odd construction to refer to unknown liabilities as "then outstanding;" rather, unknown liabilities are more commonly referred to as "contingent" or "unknown," as opposed to "then outstanding." Relatedly, the 1960 Agreement provided that the balance sheet on Exhibit A of the Agreement accurately reflected the assets, liabilities, and financial status of People's Gas and that People's Gas had "no liabilities of any nature, whether accrued, absolute, contingent or otherwise, and whether for taxes, contract or tort claims or otherwise, for which adequate provision [had] not been made in Exhibit A or by insurance . . . ." This reaffirms that Wisconsin Gas did not intend to assume any unknown liabilities of People's Gas. Finally, it would be unreasonable to conclude that Wisconsin Gas would agree to assume unknown and potentially unlimited liabilities of People's Gas in light of the limiting language in the Agreement; the representations by People's Gas regarding the accuracy of its assets and liabilities; and a contract provision that required an updated valuation of the net book value of the assets (i.e. excess of assets over liabilities) as of the closing date in order to precisely calculate the exact purchase price.

¶ 22. In addition, it is important that we not blur, but rather maintain, the well-established and fundamental distinction between an asset purchase and a stock purchase. As described by one commentator,

89

"asset purchases feature the advantage of specifying the assets to be acquired and the liabilities to be assumed."[9] It is understood that:

> An important reason for structuring an acquisition as an asset transaction is the desire on the part of a buyer to limit its responsibility for liabilities, particularly unknown or contingent liabilities.

> Unlike a stock purchase or statutory combination, where the acquired corporation retains all of its liabilities and obligations, known and unknown, the buyer in an asset purchase has an opportunity to determine which liabilities of the seller it will contractually assume.[10]

¶ 23. Courts have also recognized this distinction, observing that the "rule of non-liability for asset acquisitions is frequently the reason why parties choose that option in acquiring a business, as opposed to a merger or stock acquisition, in which the predecessor's obligations and liabilities continue in the surviving entity." *Lockheed Martin Corp. v. Gordon,* 16 S.W.3d 127, 134 (Tex. Ct. App. 2000). In other words, the general rule of non-liability in an asset purchase is "based upon the premise that when one corporation sells its assets, it transfers an interest distinct from that of the corporate entity itself. The rule protect[s] a bona fide purchaser from liabilities caused by a predecessor corporation of which the bona fide purchaser was unaware at the time of acquisition."[11]

---

[9] Byron F. Egan et al., *Asset Acquisitions: A Colloquy,* 10 U. Miami Bus. L. Rev. 145, 149 (2002).

[10] *Id.* at 152.

[11] Eva M. Fromm, *Allocating Environmental Liabilities in Acquisitions,* 22 J. Corp. L. 429, 441 (1997) (footnote omitted).

¶ 24. The importance of how a transaction is structured is illustrated by discussions of acquisition agreements in publications by law firms and legal service providers. For example, stock versus asset acquisitions have been discussed in the following manner:

> A buyer may either purchase the assets of a seller or the stock of the seller's corporation to effectuate an acquisition. An asset purchase provides greater security to the buyer that no undisclosed or contingent liabilities will be transferred. In a stock sale, all undisclosed or contingent liabilities remain with the corporation.[12]

[12] Howard S. Goldman, Esq., *Business Acquisitions,* Goldman & Pease, at http://www.goldmanpease.com/howard/business_acquisitions.htm (Feb. 6, 2003).

Similarly, other publications have stated:

> The decision to purchase stock versus assets is usually driven by tax and liability considerations. The stock purchase agreement is more useful than the asset purchase agreement when you are purchasing a portion of the business for investment purposes as opposed to buying the entire business. The asset purchase agreement is best when there may be hidden or visible liabilities that you want to avoid. You can leave those with the original corporation.

*Acquisition Agreements,* Partnering Agreements, at http://partneringagreements.com/acquisitionagreementslist.htm (Feb. 6, 2003).

> Sellers will generally prefer a Stock Purchase because it allows them to completely step away from the business. . . . In addition, a seller is usually entitled to pay taxes at the lower capital gains rate in a Stock Purchase. . . .
>
> Conversely, a buyer generally prefers an Asset Purchase. The buyer knows exactly which assets are being acquired and which liabilities are being assumed. This is particularly important to a

¶ 25. Nevertheless, Columbia Propane claims that the 1960 Agreement is ambiguous regarding whether Wisconsin Gas assumed all liabilities of People's Gas, including unknown liabilities. We first note that contract language is ambiguous only if it is reasonably susceptible to more than one meaning. *Wausau Underwriters Ins. v. Dane County*, 142 Wis. 2d 315, 322, 417 N.W.2d 914 (Ct. App. 1987). In this case, the language in the 1960 Agreement is not reasonably susceptible to more than one meaning in light of the limiting language in the contract, the general rule of non-liability for a purchasing corporation in an asset purchase, and the manner in which asset purchase agreements are typically understood and used in the business community. However, even if the contract is considered ambiguous regarding the liabilities assumed by Wisconsin Gas, we will adopt a construction that is reasonable, fair, and just, as opposed to one that is unusual or extraordinary. *Carey v. Rathman*, 55 Wis. 2d 732, 738, 200 N.W.2d 591 (1972). In ascertaining the meaning of a contract that is ambiguous, "the more reasonable meaning should be given [effect] on the probability that persons situated as the parties were would be expected to contract in that way as opposed to a way which works an unreasonable result." *Id.* Therefore, even if the contract might be considered ambiguous regarding the liabilities assumed by Wisconsin Gas,

---

buyer if the business has a significant number of actual or potential liabilities, and it is difficult to quantify the amount of those liabilities.

*Basic Deal Structures - Stock Purchase vs. Asset Purchase,* USBX, at http://www.usbx.com/articles/edu_basicdealstructures. asp (Feb. 6, 2003).

the more reasonable, fair and just construction, which conforms with established business practices, is that Wisconsin Gas only assumed certain *known* liabilities in the 1960 Agreement.

¶ 26. Thus, we hold that Wisconsin Gas did not expressly or impliedly assume unknown tort liabilities of People's Gas based on the following: (1) the 1960 Agreement was an asset purchase agreement, where the general rule is that a purchasing corporation does not succeed the liabilities of the selling corporation; (2) nowhere in the language of the 1960 Agreement does Wisconsin Gas explicitly assume any unknown liabilities of People's Gas—rather, the language indicates to the contrary; and (3) the only rational business interpretation of the contract is that Wisconsin Gas assumed certain *known* liabilities. Accordingly, we conclude that the only reasonable interpretation of the 1960 Agreement is that Wisconsin Gas did not assume any unknown liabilities; therefore, we affirm the circuit court's grant of summary judgment in favor of Wisconsin Gas.

¶ 27. Finally, we briefly address Columbia Propane's argument that the change from a stock purchase to an asset purchase was merely a change in form, which had the same effect. Columbia Propane relies on the letter sent by Wisconsin Gas to the PSC informing it of the change, which stated: "Except for such change in form, it is contemplated that the price and other terms and the ultimate effect of the transaction would be the same as originally contemplated . . . ." Columbia Propane claims that since the change was merely one of form, the transaction was supposed to have the same effect; namely, that Wisconsin Gas assumed all the liabilities of People's Gas. We cannot agree.

¶ 28. First, the original stock purchase agreement, which was cancelled and superseded by the asset purchase agreement did not contain the same language regarding Wisconsin Gas's assumption of liabilities. The stock purchase agreement merely stated that Wisconsin Gas "agrees to buy from the Stockholders at the time of closing . . . all of the outstanding capital stock (the 'Stock') of People's Gas Company." On the other hand, the asset purchase agreement provided that "Such sale, conveyance, transfer and delivery [of assets] shall be made free and clear of any liability, obligation, imperfection of title, lien or encumbrance except only those referred to in paragraph 4(d) hereof and those liabilities and obligations which are to be assumed by Milwaukee [Wisconsin Gas] at the closing . . . ." Thus, despite Columbia Propane's assertion, the two agreements were not exactly the same, but rather illustrated the difference between a stock purchase and an asset purchase. Both parties agreed to change the transaction from a stock purchase to an asset purchase and informed the PSC of the change, which was then approved by the PSC. The only comment by the PSC in its Findings of Fact, Opinion, and Order regarding the supposed "same effect," despite the change in form, was that "the aggregate acquisition cost of the assets of People's Gas will not be changed thereby." Thus, it seems that the "effect" the PSC was concerned about dealt with the general acquisition of People's Gas by Wisconsin Gas for a similar purchase price, not whether Wisconsin Gas would assume all the liabilities of People's Gas.

¶ 29. Second, as previously discussed, the difference in a buyer's assumption of liabilities when entering into a stock purchase agreement versus an asset purchase agreement is well-known in the business community. This distinction was clearly illustrated by

the different language used in the original stock purchase agreement as compared to the asset purchase agreement. We are unable to determine from the record why Wisconsin Gas proposed to change the transaction from a stock purchase to an asset purchase—perhaps it might have realized that an asset purchase was a more appropriate method to accomplish its intention of acquiring the assets of People's Gas. Nevertheless, the relevant point is that the transaction was changed from a stock purchase to an asset purchase, which specifically provided that Wisconsin Gas would only assume certain liabilities of People's Gas.

¶ 30. Accordingly, based on the language in the asset purchase agreement, in which Wisconsin Gas assumed only certain liabilities, thereby differing from the language in the original stock purchase, as well as the established differences between a stock purchase and an asset purchase with respect to a buyer's assumption of liabilities, we conclude that the change in the form of the transaction was not just a superficial and inconsequential alteration.

¶ 31. In sum, we conclude that Wisconsin Gas did not expressly or impliedly assume any unknown tort liabilities of People's Gas in the 1960 Agreement. Therefore, we uphold the circuit court's grant of summary judgment in favor of Wisconsin Gas.

¶ 32. Further, we uphold the circuit court's decision to deny Columbia Propane's motion to amend its complaint to add constructive fraud. The circuit court denied the amendment since it had already granted summary judgment in favor of Wisconsin Gas and deemed it would be unfair to allow Columbia Propane to effectively resurrect the action on a different theory. It is within a circuit court's discretion to decide whether

to permit an amendment to a complaint later than six months after it has been filed. *Employees Local 1901,* 146 Wis. 2d at 737. Based on our review of the facts and the record in this case, we conclude that the circuit court did not erroneously exercise its discretion in denying Columbia Propane's late amendment.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 33. JON P. WILCOX, J., did not participate.