DAVID T. PROSSER, J.
¶ 52. (dissenting). Amjad Tufail (Tufail) and Midwest Hospitality, LLC (Midwest) entered into a lease in which Tufail unambiguously *653 warranted that there were no local ordinances that would prevent Midwest from operating a fast-food Church's Chicken restaurant on Tufail's property. The majority opinion concludes that Tufail did not breach this warranty because the lease did not define "Church's Chicken" as a fast-food restaurant. However, the only reasonable meaning of "Church's Chicken" is a fast-food restaurant.
¶ 53. Even if the lease were deemed ambiguous, the extrinsic evidence demonstrates that Church's Chicken is a fast-food restaurant, and both parties were aware of that fact when they signed the lease. Tufail's warranty that no ordinances prevented the operation of a Church's Chicken was false because the Milwaukee zoning code requires any freestanding fast-food restaurant to have a special use permit. Therefore, Tufail breached the lease.
¶ 54. The majority opinion employs a sterile, technical interpretation of the lease that abandons the basic principles of contract interpretation. When interpreting a contract, the court's goal has always been to effect the intent of the parties as it is expressed in the language of the contract. The importance of upholding this principle cannot be overstated because people in business use contracts to try to minimize uncertainty in relation to their reasonable expectations.
¶ 55. Parties generally enter agreements to advance their economic interests. Risks, of course, are inevitable. But if one party is able to frustrate the basic purpose of a contract through an unreasonable interpretation of its terms and commitments, instability will follow, and we will be left with a system of law that rewards the more cunning party and disregards mutual intent. Because the majority opinion supports an im *654 plausible interpretation of the lease contract in this case, I must respectfully dissent.
I
¶ 56. In 2000 Tufail purchased a property with a freestanding building located at 1635 West North Avenue (the Property) in Milwaukee. The Property was operated as a New York Chicken fast-food restaurant, and Tufail continued that operation until the fall of 2007. The Property had formerly been a Church's Chicken. In fact, Tufail later testified that "it was an old design Church's Chicken which [he] was running." Tufail was not inexperienced in the restaurant business; he owned four other restaurants.
¶ 57. When he acquired the Property in 2000, Tufail wanted to continue operating the fast-food restaurant. His request was denied by a city plan examiner. Tufail was told that a fast-food restaurant was a special use under the zoning code and he would need to obtain a special use permit. He eventually acquired a ten-year special use permit from the Milwaukee Board of Zoning Appeals (BOZA). When Tufail temporarily closed the restaurant in or about October of 2007, he had approximately three years left on his ten-year special use permit before it would have to be renewed.
¶ 58. Midwest approached Tufail about opening a Church's Chicken restaurant at the Property both before and after Tufail shut down operation of his New York Chicken. Midwest is a corporate entity that operates Church's Chicken restaurants and is owned by Aslam Khan (Khan). Munshi Ali, a Church's Chicken manager at a different location, approached Tufail four or five times and stated that Khan wanted to lease Tufail's property to operate a Church's Chicken. Khan *655 himself eventually visited the Property with several other people affiliated with Church's Chicken. Khan stated that he owned many Church's Chicken restaurants in the Midwest and said that Tufail's property value would go up if Church's Chicken moved in.
¶ 59. Two or three days after Khan visited the Property, Khan sent an agent, Tariq Malik (Malik), to Tufail with a lease drafted by Midwest. Malik and Tufail went to Tufail's attorney, who made some changes to the lease. However, the attorney did not alter Paragraph 5, which contained the provisions regarding the use of the premises. At some point before he signed the lease, Tufail visited a Church's Chicken at another location to see how Midwest would alter the Property.
¶ 60. Tufail and Midwest entered into a five-year lease (the Lease) for the Property in March 2008. The "Use of Premises" section in Paragraph 5 of the Lease stated:
Tenant may use and occupy the Premises for any lawful purpose, including, but not limited to, the retail sales, consumption, and delivery of food and beverages which shall include, but not be limited to, Chicken products, Fish products, bread products, salads, sandwiches, dessert items, promotional items, and any other items sold by any Church's Chicken store.
¶ 61. The "Representations and Warranties" section of the Lease, in Paragraph 33(g), stated that the landlord represents and warrants that "no existing restrictions, building and zoning ordinances, or other laws or requirements of any governmental authority prevent the use of the Premises for the purposes set forth in Paragraph 5."
¶ 62. The Lease also stated at the end of the "Representations and Warranties" section that the rep *656 resentations and warranties "are material ones, and Landlord accordingly agrees that any misrepresentation or breach of such warranty will be reason for Tenant to terminate this Lease."
¶ 63. Regarding interpretation of these provisions, Paragraph 38 of the Lease said, "This Lease shall be interpreted to the broadest extent possible to give full and fair meaning to the intentions of the parties hereto." (Emphasis added.)
¶ 64. Midwest entered the Property and began remodeling it in May 2008. According to Midwest, the Property required a substantial amount of cleaning and repair work. However, Midwest suspended the renovation when it was denied a building permit.
¶ 65. When Midwest applied for that permit, it was told that it would have to apply for a special use permit to operate a fast-food restaurant in a freestanding building. The examiner for the City, Barbara Jones, stated in her denial letter that the Milwaukee zoning code did not allow the Property to be used as a fast-food restaurant. Thus, Midwest unexpectedly learned that it was faced with the same obstacles with zoning ordinances that Tufail had faced roughly eight years earlier. What Midwest did not know was that Tufail's business had been cited for 21 health code violations by the city in 2007 and had antagonized a lot of nearby residents.
¶ 66. On May 29, 2008, Midwest applied for a special use permit to operate a fast-food restaurant with a drive-through within 150 feet of residential property. Four sections of the City of Milwaukee zoning code were in play. Section 295-203-9.f. defines a sit-down restaurant as:
a restaurant where the food or beverages sold are consumed at tables located on the premises, where *657 taking food or beverages from the premises is purely incidental, where food or beverages are normally served utilizing nondisposable containers and utensils and where the consumption of food or beverages in vehicles on the premises in which the building is located does not regularly occur, or where the restaurant is located within a building containing more than one principal use other than another restaurant. This term does not include a tavern.
¶ 67. Section 295-203-9.g. defines a fast-food or carry-out restaurant as "a restaurant other than a sit-down restaurant where the manner of preparation, packaging and serving of food or beverages encourages their consumption outside the building. This term does not include a tavern." Section 295-603-2.o. requires that a fast-food restaurant be in a building containing at least one permitted use, or the restaurant must get a special use permit. Finally, Section 295-603-2.j.3. states that a drive-through may not be located within 150 feet of residential property.
¶ 68. Midwest's intended use of the Property was inconsistent with the definition of a sit-down restaurant. The city immediately recognized that Church's Chicken, like the prior New York Chicken, is a fast-food restaurant and it would likely expect to use the existing drive-through. Thus, without a special use permit, operating a Church's Chicken on the Property would violate two separate zoning code provisions: the prohibition against operating a freestanding fast-food restaurant and the prohibition against having a drive-through within 150 feet of residential property.
¶ 69. In September 2008, approximately six months after it signed the Lease, Midwest obtained a special use permit to operate the restaurant. However, the city imposed very different conditions on Midwest *658 from the conditions it had imposed on Tufail. Tufail obtained a ten-year permit; Midwest received a one-year permit with no assurance of renewal. Tufail was permitted to operate until 4:00 a.m. Midwest could operate its Church's Chicken until only 9:00 p.m. The city's permit also required Church's Chicken to pick up all garbage within a one-block radius of the Property. The president of Falcon Holdings, which operates Midwest, testified that it would be too expensive to take care of all the garbage within a block of the Property and that a Church's Chicken would be less profitable if it had to close at 9:00 p.m.
¶ 70. The BOZA chairman stated that Midwest faced a difficult decision whether to invest "hundreds of thousands of dollars for a one year approval by this board. There is no guarantee of an approval after one year." The local community appeared to share the chairman's concern, and many city residents opposed the special use permit.
¶ 71. Due to the long delay in obtaining any special use permit and then the severe restrictions added to the permit, Midwest stopped paying rent.
II
¶ 72. The plain language of the Lease unambiguously demonstrates that the parties intended for Midwest to operate a Church's Chicken fast-food restaurant on the Property. The court's goal in contract interpretation is to discern the intentions of the parties as expressed in the language of the contract. Town Bank v. City Real Estate Dev., LLC, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W.2d 476. The court will look at the ordinary meaning of the contractual language, and if it is unambiguous, the contractual interpretation remains *659 within the four corners of the contract. Id. A contract is ambiguous when "it is susceptible to more than one reasonable interpretation." Id.
¶ 73. The broad language in the Lease unambiguously suggests that Midwest could have operated almost any lawful business on the Property. Paragraph 5 of the Lease states that "Tenant may use and occupy the Premises for any lawful purpose . ..." It was not unreasonable for Midwest to assume that it could operate a freestanding fast-food restaurant because that is a seemingly lawful purpose and because New York Chicken had operated on the property in that manner. Moreover, the Lease quickly narrows its intent by adding the words "including. . . the retail sales, consumption, and delivery of food and beverages." Then the Lease pinpoints its objective by naming "Chicken products, Fish products, bread products, salads, sandwiches, dessert items, promotional items, and any other items sold by any Church's Chicken store." (Emphasis added.)
¶ 74. The Lease in this case is unambiguous because it uses "Church's Chicken" according to its ordinary meaning: a fast-food restaurant.[1] The Lease states that Midwest may use the Property for "retail sales, consumption, and delivery of food and beverages which shall include . . . Chicken products . . . and any other items sold by any Church's Chicken store."
¶ 75. Courts must interpret a contract "in the manner that it would be understood by persons in the business to which the contract relates." Columbia Pro *660 pane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 776.[2] In the restaurant business, "Church's Chicken is a highly recognized brand name in the Quick Service Restaurant sector and is one of the largest quick-service chicken concepts in the [w]orld." Church's Chicken Celebrates Its Southern Hospitality with Kick Off of New Advertising Campaign, (Nov. 3, 2011), http://www.businesswire.com /news/home/20111103005028/en/Church%E2%80%99sChicken-Celebrates-Southern-Hospitality-Kick-Advertising. Because of Church's Chicken's "highly recognized brand name," the court of appeals had no trouble asserting that, "[i]t is undisputed here that a Church's Chicken is a fast-food restaurant. It was not necessary for the use provision in the lease to include additional words allowing operation of a fast-food restaurant. A Church's Chicken is a fast-food restaurant." Tufail v. Midwest Hospitality, LLC, No. 2011AP1451, unpublished slip op., ¶ 8 (Wis. Ct. App. Aug. 1, 2012).
¶ 76. Even though Tufail is correct that not everyone would understand what a Church's Chicken is, its reputation in the restaurant industry demonstrates that those in the business would know that it is a fast-food restaurant.[3] Since the only reasonable meaning of "Church's Chicken" is a fast-food chicken restaurant, a paragraph that allows for the sale of "items sold by any Church's Chicken store" unambiguously contemplates the operation of the Property as a fast-food restaurant.
*661 ¶ 77. Furthermore, the Lease explicitly calls for broad interpretation to avoid an unfair reading of the contract and to "give full and fair meaning to the intentions of the parties." It would not be reasonable to define "Church's Chicken" in a way that contradicts its true definition. Midwest persuasively argues that "Church's Chicken" must refer to a fast-food restaurant because all Church's Chicken restaurants are fast-food restaurants. Since the zoning code did not permit a fast-food restaurant on the Property and Church's Chicken is a fast-food restaurant, Tufail's warranty that no ordinances prevented the operation of a Church's Chicken on the Property was false.[4]
¶ 78. The problem with Tufail's warranty is apparent when compared to another Lease provision. Paragraph 24(b) says, "If allowed by local governmental authorities, Tenant shall have the right to erect and maintain exterior free standing sign(s) in the location set forth on Exhibit 'A'. Landlord agrees to cooperate fully with Tenant in obtaining all required governmental permits, licenses, approvals and variances for Tenant's sign(s)." This paragraph is clear that the tenant might need to get government permits or variances in order to erect the desired signage. In contrast, Paragraph 33(g) provides a broad warranty that there are no "requirements of any governmental authority" that would prevent the tenant from using the Property *662 as specified in Paragraph 5. Tufail was not forced to embrace the broad warranty in Paragraph 33(g). He could have made a qualified commitment as appears in Paragraph 24(b), or he could have forthrightly disclosed the zoning regulations and made the Lease contingent upon receipt of a satisfactory special use permit. However, because Tufail warranted that there were no zoning requirements with which Midwest had to comply in order to sell Church's Chicken products in a fast-food restaurant, Tufail must be held to his promise.
Ill
¶ 79. Tufail's warranty that no restrictions prevent the operation of a Church's Chicken is unambiguous, but even if "Church's Chicken" is deemed ambiguous, the parol evidence demonstrates that the parties understood Church's Chicken to be a fast-food restaurant. If a contract is ambiguous, the court may use parol evidence to explain the ambiguous term. Town Bank, 330 Wis. 2d 340, ¶ 38. Tufail admitted that "[t]he intended purpose of the Lease, as represented by Midwest, was for it to open a new Church's Chicken restaurant at the Leased Premises." Tufail had to know that Church's Chicken is a fast-food restaurant because his New York Chicken restaurant was an old Church's Chicken. Furthermore, Tufail saw that Church's Chicken is a fast-food restaurant when he visited one before signing the Lease.
¶ 80. Tufail's visit is important because the parties' course of dealings can clarify contractual ambiguities. See Martinson v. Brooks Equip. Leasing, Inc., 36 Wis. 2d 209, 219, 152 N.W.2d 849 (1967). In Martinson, the contract for the construction of a pool was ambiguous because it incorporated plans for a pool but did not explicitly incorporate plans for a filter system. Id. at *663 218-19. However, the evidence showed that the appellant knew that the filter system was part of the plans for the pool. Id. Furthermore, because the plans for the pool included the plans for the filter system and the contractor used a single set of plans to construct both, the plans for the filter system were part of the contract. Id. at 219-20. The course of dealings in the present case demonstrates that Tufail knew what the term "Church's Chicken" meant. He had visited another Church's Chicken fast-food restaurant to see how Midwest would alter the Property. This visit shows that the parties knew and intended that Midwest would operate a fast-food restaurant on the Property.
¶ 81. Tufail's interpretation of the Lease is also suspect because it would render the inclusion of "Church's Chicken" meaningless, and courts avoid interpreting contracts to make portions superfluous. See DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship, 2004 WI 92, ¶ 44, 273 Wis. 2d 577, 682 N.W.2d 839. In DeWitt, a law firm provided services to Galaxy under a contract that charged interest on untimely payments, but Galaxy had no assets or income. Id., ¶ 7. Galaxy's owner guaranteed full payment, but the guaranty was silent as to whether the owner would pay interest. Id., ¶ 43. It would have been meaningless to include the interest clause in the contract with Galaxy, a company with no assets, unless the owner's guaranty for full payment included a guaranty to pay the interest. Id., ¶¶ 46-47. Similarly, it would make little sense for the Lease to mention "Church's Chicken" four times if that term could refer to any type of restaurant. Tufail seems to suggest that since the Lease does not explicitly define "Church's Chicken," no warranty would be violated if a Church's Chicken could open and operate under any circumstance. However, *664 the "Church's Chicken" term is useful only if it refers to the Church's Chicken fast-food restaurants that actually exist.
IV
¶ 82. After a trial, the circuit court ruled in favor of Tufail. In so doing, the court appears to have overlooked or discounted critical testimony, minimized the fast-food zoning problem to focus on the drive-through, shifted the blame to Midwest for failing to engage in due diligence, and disregarded an explicit provision in the Lease.
¶ 83. From the outset, Midwest sought to lease Tufail's property to open and operate a Church's Chicken fast-food restaurant. Paragraph 33(g) of the Lease was designed to minimize the hazard of an existing zoning barrier against the operation of a traditional Church's Chicken restaurant and to provide an escape clause from a five-year lease if an existing barrier unexpectedly materialized. Midwest no doubt wanted a drive-through which is often, if not always, a component of a fast-food restaurant. If a drive-through were the sole or major sticking point, the specific representations in the Lease might present a different case.
¶ 84. The circuit court recast the facts and narrowed the issue. The circuit court found that "there was no evidence presented that Tufail knew about the many other Church's Chicken restaurants, whether or not they had drive-through operations or other Church's Chicken franchise requirements."
¶ 85. In my view, the statement about Tufail's knowledge is clearly erroneous, and the court's emphasis on the drive-through problem fails to deal with *665 Midwest's legal argument that there were two zoning problems they had to face, contrary to Tufail's warranty.
¶ 86. As to his knowledge, Tufail testified that the restaurant he bought in 2000 was a drive-through and carry-out fast-food restaurant:
Q All right. And when you bought [the Property], was it an ongoing restaurant?
A It was a running restaurant. It was a chicken place.
Q What was the name of it then?
A At that time it was a New York Chicken. But basically it was a Church's Chicken place closed down. And the [previous owner], he bought it from Church's Chicken and put the name— They didn't let him use their Church's Chicken. They— So he put a New York Chicken [there].
(Emphasis added.)
¶ 87. Tufail acknowledged that "it was an old design Church's Chicken which [he] was running." (Emphasis added.) He said that he used Church's Chicken equipment in his New York Chicken and suggested that Church's Chicken use the same equipment for its new operation. Tufail visited another Church's Chicken in Milwaukee, and he discussed the new interior and exterior alterations that Midwest intended to make. He expected that Midwest would make his property look like other Church's Chicken restaurants. He testified that the purpose of the Lease "as it was presented by Midwest [was] to open a new Church's Chicken restaurant at the leased premises."
¶ 88. In March 2007, before the Lease was fully negotiated and signed, Tufail was visited by Khan who *666 oversees more than 100 Church's Chicken franchises in the Midwest. The circuit court and the majority appear to believe that Khan and Tufail never discussed what a Church's Chicken restaurant is all about, so that Tufail really did not know. This view of the facts is unrealistic if not incredible and is directly contrary to Tufail's acknowledgment at trial that he understood Midwest could not operate the Property without a special use permit.
¶ 89. In short, the court's finding that Tufail knew nothing about other Church's Chicken restaurants cannot be squared with the record.
¶ 90. The court made another questionable finding of fact. The court found that, "[i]n early 2008, after the [New York Chicken] restaurant had closed, Tufail was then approached by representatives of Midwest Hospitality who sought to lease the subject property." (Emphasis added.) Tufail's attorney, citing the record, writes in his brief: "Midwest had approached Tufail about opening a Church's Chicken restaurant at the location prior to and immediately after Tufail temporarily ceased operations of his chicken restaurant." (Emphasis added.) In short, Tufail's attorney corrected the circuit court's findings of fact.
¶ 91. The court of appeals — in its recitation of facts — simply disregarded the circuit court's mistaken "findings" on both matters discussed above.
¶ 92. As noted, the circuit court found that "there was no evidence that Tufail knew. . . whether other Church's Chicken restaurants had drive-through operations." It also found that "the vast majority of Church's Chicken restaurants have drive-through operations, but not all." (Emphasis added.) The latter finding is correct, but it is seriously incomplete. The court made no finding that there was any Church's Chicken restaurant *667 that was not a fast-food restaurant. The court also made no finding that there was any freestanding Church's Chicken that did not have a drive-through operation. More important for purposes of this case is that the Property had been operated as a freestanding fast-food restaurant and was intended by Midwest to be operated as a freestanding Church's Chicken fast-food restaurant. The point is that the Property's operation as a fast-food restaurant was not allowed by the Milwaukee zoning code without a special use permit. Tufail warranted otherwise.
¶ 93. Although the circuit court made sparse findings of fact about Church's Chicken restaurants, it made lengthy findings about Midwest's lack of due diligence. The court said:
Brian Parrish is a commercial real estate broker who testified about industry custom and practice relating to commercial leases. Parrish testified that prior to entering into commercial leases parties routinely perform due diligence and described that as the period of time prior to the occupant taking occupancy to uncover any issues that they may encounter that would inhibit them from doing what they intend to do at that property, and that includes government approvals, construction costs, financing, inspections. He further testified that any issues of import to the tenant!,] those items could have been a contingency a due diligence item, in the lease. Midwest Hospitality did not perform proper due diligence. In fact, Mr. Habash specifically testified that Midwest Hospitality didn't do any due diligence. He stated it was because of trust and assurances by Mr. Tufail. But the Court does not find the testimony of Mr. Habash about reliance on Mr. Tufail credible. Mr. Habash is a senior executive at Midwest Hospitality who has been involved with the lease and renovation of many prior Church's Chicken restau *668 rants. Mr. Habash is the president of the independent franchise council of over 750 such restaurants. Mr. Habash was at the subject property before entering into the lease and saw its poor condition. It is not credible to believe that Mr. Habash relied upon statements of Mr. Tufail when making the decision of whether or not to have Midwest Hospitality enter into the subject lease. Rather, it is more credible that Mr. Habash relied upon his own knowledge, experience, and personal inspection.
(Emphasis added.)
¶ 94. The circuit court's oral decision suggests that the court believed that Midwest should have thoroughly investigated all applicable zoning requirements before signing the Lease — that Paragraph 33(g) does not mean anything because Midwest should have previously discovered the requirements for a special use permit. These sentiments appear to substitute the court's expectations for the parties' intentions.
¶ 95. The majority opinion does not acknowledge the circuit court's reliance on "due diligence" as a justification for not enforcing the warranties in the Lease. This raises a very important issue of contract law.
¶ 96. This court has observed that, "in general, the laws in existence at the time of the contract are incorporated into that contract." Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶ 60, 295 Wis. 2d 1, 719 N.W.2d 408 (citing Von Hoffman v. City of Quincy, 71 U.S. 535, 550 n.30 (1866)). The court of appeals has said: "It must be assumed that parties to a contract had knowledge of the law in effect at the time of the agreement." Krause v. Mass. Bay Ins. Co., 161 Wis. 2d 711, 718, 468 N.W.2d 755 (Ct. App. 1991) (citing Menard v. Sass, 127 Wis. 2d 397, 399, 379 N.W.2d 344 (Ct. App. 1985)).
¶ 97. Although these principles may be sound in general, parties seldom have equal knowledge of the *669 law. One party cannot sign a contract assuring the other party that it will have no problems under existing law and then assert a due diligence defense when that assurance proves false. This axiom was eloquently stated in the English case of Redgrave v. Hurd:
There is another proposition of law of very great importance which I think it is necessary for me to state, because, with great deference to the very learned Judge from whom this appeal comes, I think it is not quite accurately stated in his judgment. If a man is induced to enter into a contract by a false representation it is not a sufficient answer to him to say, "If you had used due diligence you would have found out that the statement was untrue. You had the means afforded you of discovering its falsity, and did not choose to avail yourself of them." I take it to be a settled doctrine of equity, not only as regards specific performance but also as regards rescission, that this is not an answer unless there is such delay as constitutes a defence under the Statute of Limitations.
Redgrave v. Hurd, [1881] 20 Ch.D. 1 at 13 (Eng.) (first emphasis added). One hundred years later, this ancient doctrine was embodied in our Restatement (Second) of Contracts, § 172 (1981): "A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing."
¶ 98. If the Supreme Court of Wisconsin intends to reject these principles, it ought to explain why. Rejection of these principles will certainly have implications for the enforcement of Wis. Stat. § 100.18, which was one of Midwest's counterclaims in this case.
¶ 99. One other item undermines the ruling of the circuit court. The court looked to Paragraph 5 of the *670 Lease and said: "If Paragraph Five were vague or ambiguous in any way, the Court finds that the language contained therein was drafted by Midwest Hospitality and it should be construed against the drafter." This is directly contrary to Paragraph 36 of the Lease, which provides in part: "Landlord and Tenant have negotiated the terms of this Lease; therefore, this Lease shall not he interpreted or construed against or in favor of any party." (Emphasis added.)
¶ 100. In sum, the majority opinion heavily relies on the findings of fact and conclusions of law of the circuit court and completely rejects the well-considered decision of the court of appeals. This is a mistake of the first order.
V
¶ 101. The majority opinion also relies on the "integration clause" in the contract as precluding any consideration of parol evidence. This too is an error because the integration clause applies only to prior agreements. An integration clause "does not bar the use of extrinsic evidence to clarify the meaning of an ambiguous text." Roth v. City of Glendale, 2000 WI 100, ¶ 49, 237 Wis. 2d 173, 614 N.W.2d 467 (Sykes, J., concurring) (quoting Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993)); see also Restatement (Second) of Contracts § 214 (extrinsic evidence is admissible to establish the meaning of a writing even if integrated).
¶ 102. If there is an integration clause, courts "may not consider evidence of any prior or contemporaneous oral or written agreement between the parties." Town Bank, 330 Wis. 2d 340, ¶ 37 (footnote omitted). In Town Bank, there was a commitment letter *671 before the parties signed the contract, and the integration clause in the contract precluded consideration of the prior commitment letter. Id., ¶ 41. In the present case, there was no prior oral or written agreement regarding the Property or the definition of "Church's Chicken." If there were any ambiguity in the term "Church's Chicken," the integration clause would not prevent the use of extrinsic evidence to interpret that term in the Lease.
¶ 103. Even if the Lease were viewed as not specifying the operation of a Church's Chicken fast-food restaurant, the intent of the parties compels that interpretation. Paragraph 5 of the Lease allows for the use of the Property to sell items traditionally sold by any Church's Chicken. Items traditionally sold by Church's Chicken are fast-food items, and the only reasonable interpretation is that an establishment selling fast-food items is a fast-food establishment. Because the court's goal in construing a contract is to give effect to the parties' intent, Town Bank, 330 Wis. 2d 340, ¶ 33, it is reasonable to interpret the inclusion of "Church's Chicken" to mean that Midwest could operate a Church's Chicken fast-food restaurant.
VI
¶ 104. The majority opinion leans upon the fact that Midwest ultimately attained a special use permit to operate a fast-food restaurant with a drive-through. This does not remedy Tufail's false warranty. The Lease warranted that there were no ordinances or restrictions preventing the uses specified in Paragraph 5. While Midwest obtained a one-year special use permit, that permit did not change the fact that operating a freestanding restaurant at the Property was not a permitted use. The city plan examiner denied Midwest's ap *672 plication to operate a Church's Chicken on the Property because the zoning code prevented such a use. Midwest could have terminated the Lease at that point, but it acted in good faith and worked hard to obtain a special use permit. Unfortunately, the excessive restrictions in the permit prevented Midwest from operating a Church's Chicken because the restrictions made it economically impracticable to do so.
¶ 105. Tufail had a permit to operate his New York Chicken from 10:00 a.m. to 4:00 a.m. — 18 hours a day, seven days a week. Midwest received a permit that allowed it to operate until only 9:00 p.m., which likely was seven hours per day and 49 hours per week less than Tufail had operated. If the Church's Chicken restaurant were designed to open at 11:00 a.m., the restaurant would operate only ten hours per day. This completely scuttled Midwest's business model for a restaurant located at the intersection of North Avenue and 17th Street in Milwaukee.
¶ 106. Moreover, the special use permit imposed another economic burden that prevented the operation of a Church's Chicken. The requirement that Midwest pick up garbage within a one-block radius of the Property was prohibitive. As the majority points out, a Midwest representative testified that the special use permit imposed restrictions that would have made the operation of a Church's Chicken "impossible." Majority op., ¶ 14. An economic impossibility is just as preventative as a physical or legal impossibility. The circuit court apparently failed to consider these insurmountable economic burdens when it stated that the special use permit "did not prevent, in any way, Midwest Hospitality from opening a Church's Chicken restaurant at the subject property with a drive-through and as a fast food restaurant." The special use permit's restric *673 tions and uncertainty effectively prevented the operation of the Church's Chicken that the parties intended.
VII
¶ 107. When Tufail signed the Lease, he misrepresented that there were no ordinances that would prevent any use of the Property contemplated in Paragraph 5 of the Lease. Although the Lease did not define "Church's Chicken," the only meaning of that term is a fast-food restaurant. Even if "Church's Chicken" is ambiguous, the parol evidence demonstrates that both parties understood that a Church's Chicken is a fast-food restaurant. Since the Milwaukee zoning code states that a freestanding fast-food restaurant is not a permitted use, Tufail breached his warranty.
¶ 108. For the foregoing reasons, I respectfully dissent.

 Interestingly, the first Church's Chicken restaurant was called "Church's Fried Chicken-To-Go." One Man, One Chicken Legacy, Churchs.com, http://www.churchs.com/about.html (last visited June 25, 2013). Church's Chicken has always been a fast-food restaurant.

 See also N. Gate Corp. v. Nat'l Food Stores, 30 Wis. 2d 317, 321, 140 N.W.2d 744 (1966); All-Star Ins. Corp. v. APS Ins. Agency, Inc., 112 Wis. 2d 329, 333, 332 N.W.2d 828 (Ct. App. 1983); 17A Am. Jur. 2d Contracts § 337 (2004).

 At trial, Tufail's own expert understood that a Church's Chicken is a fast-food restaurant and that Midwest intended to operate a freestanding Church's Chicken on the Property.

 The majority opinion observes that the circuit court made a finding of fact that not all Church's Chicken restaurants have a drive-through. Majority op., ¶ 39. However, the drive-through issue is a red herring. Church's Chicken is undeniably a fast-food restaurant chain. The zoning code prohibited the operation of a freestanding fast-food restaurant regardless of whether that restaurant had a drive-through. Tufail warranted against that obstacle.