# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP1451 |
| COMPLETE TITLE: | Amjad T. Tufail,<br>　　　　　Plaintiff-Respondent-Petitioner,<br>　　v.<br>Midwest Hospitality, LLC, d/b/a Midwest<br>Hospitality (WI),<br>LLC,<br>　　　　　Defendant-Appellant,<br>Aslam Khan, d/b/a Midwest Hospitality,<br>　　　　　Defendant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 344 Wis. 2d 297, 821 N.W.2d 412
(Ct. App. 2012 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 10, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 11, 2013 |
| | |
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Milwaukee |
| 　JUDGE: | William S. Pocan |
| | |
| JUSTICES: | |
| 　CONCURRED: | |
| 　DISSENTED: | PROSSER, J., dissents. (Opinion filed.) |
| 　NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs by *Douglas W. Rose*, *Lora L. LoCoco*, and *Rose & deJong, S.C.*, Milwaukee, and oral argument by *Douglas W. Rose*.


For the defendant-appellant, there was a brief by *Christopher T. Hale*, *Andrew G. Frank*, and *Hale and Wagner, S.C.*, Milwaukee, and oral argument by *Christopher T. Hale*.

**2013 WI 62**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2011AP1451

(L.C. No. 2009CV13848)

STATE OF WISCONSIN      :      IN SUPREME COURT

Amjad T. Tufail,

      Plaintiff-Respondent-Petitioner,

  v.

Midwest Hospitality, LLC, d/b/a Midwest Hospitality (WI), LLC,

      Defendant-Appellant,

Aslam Khan, d/b/a Midwest Hospitality,

      Defendant.

**FILED**

**JUL 10, 2013**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and remanded. The judgment of the circuit court is thereby affirmed.*

¶1 ANN WALSH BRADLEY, J. This is a review of an unpublished opinion of the court of appeals, which reversed the circuit court's judgment awarding damages in favor of Amjad Tufail (Tufail). The case before us involves a contract dispute

between the landlord, Tufail, and the tenant, Midwest Hospitality, LLC (Midwest Hospitality) over the terms of a commercial lease of property.[1]

¶2 Tufail, the petitioner, asserts that the court of appeals erred when it determined that Midwest Hospitality's early termination of the lease was justified by Tufail's misrepresentation. Although he acknowledges that the lease unambiguously provides a representation that Midwest Hospitality may not be prevented from using the property for certain specified purposes, Tufail argues that operation of a fast-food restaurant with a drive-through is not among the purposes listed in the lease. He further asserts that all of the uses identified in the lease are permitted uses of the premises under the City of Milwaukee zoning code.

¶3 Additionally, Tufail contends that the representation was not false given that the City of Milwaukee granted a special use permit allowing the operation of a Church's Chicken restaurant, including the operation of a Church's Chicken fast-food restaurant with a drive-through.

¶4 We conclude that the representation does not include any use of the property as a Church's Chicken fast-food restaurant with a drive-through. Additionally, there is no indication that any of the uses identified in the lease were prevented under the City of Milwaukee zoning code.

---

[1] Tufail v. Midwest Hospitality, LLC, No. 2011AP1451, unpublished slip op. (Ct. App. Aug. 1, 2012), reversing the circuit court, William S. Pocan, J., presiding.

2

¶5   We further conclude that the representation was not false because the circuit court found that Midwest Hospitality was not prevented from using the property for the uses specified in the lease, and its finding is not clearly erroneous. Therefore, Tufail did not breach the lease.  Accordingly, we reverse the court of appeals and remand, and the judgment of the circuit court is thereby affirmed.

I

¶6   The contract dispute in this case concerns the terms of a commercial lease for a property located on West North Avenue in Milwaukee, Wisconsin.  Tufail had previously operated a restaurant called "New York Chicken" on the property before leasing the property to Midwest Hospitality.[2]

¶7   After purchasing the property in 2000, Tufail submitted a request to the City of Milwaukee Development Center for a permit to operate a fast-food restaurant.  His application was denied, but Tufail appealed to the City of Milwaukee Board of Zoning Appeals.  On November 9, 2000, the Board of Zoning Appeals granted Tufail's request for a permit to operate a fast-food restaurant for a ten-year period.  Under the terms of the permit, the New York Chicken restaurant was allowed to remain open until 4:00 a.m.

¶8   Sometime before the New York Chicken restaurant ceased operations in 2007 and again after operations ceased, Midwest

---

[2] Tufail described the New York Chicken restaurant as "a chicken place" that was similar in nature to a Church's Chicken restaurant but with a different name.

3

Hospitality approached Tufail and inquired about opening a Church's Chicken restaurant on the property. Prior to negotiating the lease, Midwest Hospitality visited the former New York Chicken restaurant and conducted a walk-through of the property. It then prepared a written lease and the parties negotiated its terms.

¶9 Tufail and Midwest Hospitality formally executed the lease in March 2008. It was to be in effect for a five-year period beginning on April 1, 2008 and ending on March 31, 2013. Midwest Hospitality agreed to pay rent in the amount of $35,000 for the first year, which was to be paid in equal installments on a monthly basis.

¶10 Paragraph 5 of the lease specified the intended purposes for which the property may be used:

> 5. <u>Use of Premises</u>. Tenant may use and occupy the Premises for any lawful purposes, including, but not limited to, the retail sales, consumption, and delivery of food and beverages which shall include, but not be limited to, Chicken products, Fish products, bread products, salads, sandwiches, dessert items, promotional items, and any other items sold by any Church's Chicken store.

Tufail also made representations in Paragraph 33 of the lease, which provide as follows, in relevant part:

> Landlord represents and warrants to Tenant that:
>
> . . . .
>
> (g) no existing restrictions, building and zoning ordinances, or other laws or requirements of any governmental authority prevent the use of the Premises for the purposes set forth in Paragraph 5 . . . .

> Landlord hereby acknowledges that Tenant is relying upon all of the foregoing representations and warranties in executing this Lease and that matters so represented and warranted are material ones, and Landlord accordingly agrees that any misrepresentation or breach of such warranty will be reason for Tenant to terminate this Lease.

Furthermore, the lease contained an integration clause providing that the written lease set forth all understandings between Tufail and Midwest Hospitality:

> This Lease, the exhibits, rider and addendum, if any, attached hereto and forming a part hereof set forth all the covenants, promises, agreements, conditions, terms, provisions and understandings by and between the Landlord and Tenant concerning the Premises. There are no other such matters, whether oral or written, between Landlord and Tenant other than are set forth herein. No change, modification, alteration, amendment, addition or deletion to this Lease shall be binding upon Landlord or Tenant unless it is in writing and executed by the person to be so charged with the same. Landlord and Tenant have negotiated the terms of this Lease; therefore, this Lease shall not be interpreted or construed against or in favor of any party.

¶11 After the lease was executed, Midwest Hospitality entered the property and began renovation. It completed some initial preparation work, but did not ultimately complete the renovations.

¶12 The renovation work ended in May 2008 when Midwest Hospitality was informed that it needed to obtain a special use permit in order to operate a fast-food restaurant with a drive-through at the property. A special use permit is a particular type of permit required by the City of Milwaukee in order to use a property for certain purposes under the zoning code. Although

a sit-down restaurant[3] is classified as a "Permitted Use," a fast-food restaurant[4] is classified as a "Limited Use" requiring a special use permit.

¶13 Upon being advised of the permit requirement, Midwest Hospitality applied for a special use permit to operate a Church's Chicken fast-food restaurant with a drive-through on the property. The application was met with opposition by community groups that opposed adding a Church's Chicken restaurant to the neighborhood.[5]

¶14 Despite the opposition, the City of Milwaukee Board of Zoning Appeals ultimately approved Midwest Hospitality's application for a special use permit in a written decision issued on September 22, 2008. The special use permit was issued

---

[3] A "sit-down restaurant" is defined in the zoning code as "a restaurant where the food or beverages sold are consumed at tables located on the premises, where taking food or beverages from the premises is purely incidental, where food or beverages are normally served utilizing nondisposable containers and utensils and where the consumption of food or beverages in vehicles on the premises in which the building is located does not regularly occur . . . ."

[4] A "restaurant, fast-food/carryout" is defined in the zoning code as "a restaurant other than a sit-down restaurant where the manner of preparation, packaging and serving of food or beverages encourages their consumption outside the building."

[5] Midwest Hospitality in its brief describes those individuals or groups opposing its application as "neighbors, physicians, Walnut Way Conservation Corporation (a local neighborhood association) and even a Wisconsin State Representative."

subject to certain conditions, which are set forth in relevant part as follows:

> 10. That this use, both fast-food/carry-out and drive-through, closes by 9:00 p.m.
>
> 11. That this Special Use is granted for a period of one (1) year, commencing with the date hereof.

At trial, a Midwest Hospitality representative testified that the conditions in the special use permit changed the business's profitability forecast and rendered the operation of a Church's Chicken restaurant on the property not worth the investment:

> Q.  And now could you have run the Church's Chicken at 1635 West North with restrictions on the evening hours to 9:00 p.m. and a new review by [the Board of Zoning Appeals] every year?
>
> A.  No way.  It would just be impossible.  It wouldn't even be worth the investment. . . .  [The 9:00 closing restriction] changed our forecast that we had in mind for the profitability of this business . . . .

¶15 After the special use permit was approved, Midwest Hospitality notified Tufail that it would stop paying rent.  It sent a letter to Tufail arguing that it was not responsible for the lease payments because a special use permit was required to operate a Church's Chicken fast-food restaurant with a drive-through.  It therefore contended that Tufail made a false representation and that it was entitled to terminate the lease before the five-year term expired.

¶16 Tufail, in turn, commenced the present action.  He alleged a breach of contract claim, an anticipatory breach of contract claim, and a claim for breach of the duty of good faith and fair dealing.  Midwest Hospitality later pled counterclaims

7

alleging a breach of contract, deceptive advertising contrary to Wis. Stat. § 100.18 (2009-10), and unjust enrichment.

¶17 The circuit court presided over a three-day bench trial, which took place in March 2011. At the conclusion of the trial, the circuit court made findings of fact relating to the claims advanced in the pleadings. It found that the "vast majority of Church's Chicken restaurants have drive-through operations, but not all." Additionally, "Midwest Hospitality's application for a special use permit to use the subject property for a fast-food restaurant with a drive-through was approved by the City of Milwaukee," and it was not "prevent[ed], in any way, [] from opening a Church's Chicken restaurant at the subject property with a drive-through and as a fast food restaurant."[6]

¶18 Turning to examine the text of the lease, the circuit court determined that it unambiguously failed to set forth any use as a fast-food restaurant with a drive-through. It concluded that "Midwest Hospitality was able to use the subject property for its intended use as set forth in the lease." Furthermore, it determined that "even if the subject lease was interpreted to include as an intended use a fast food restaurant with a drive-through, that intended use was allowed by the City of Milwaukee." Ultimately, there was "no evidence presented that [Tufail's] representations and warranties were not true."

---

[6] Additional discussion of the circuit court's findings of fact may be found at ¶¶39-41, infra.

¶19 Because Tufail did not breach the lease, the circuit court concluded that Midwest Hospitality's early termination of the lease was itself a breach of contract. It proceeded to enter a judgment awarding Tufail $90,033.21 in damages.

¶20 Midwest Hospitality appealed and the court of appeals reversed the circuit court. Tufail v. Midwest Hospitality, LLC, No. 2011AP1451, unpublished slip op. (Ct. App. Aug. 1, 2012). It concluded that the "early termination of the lease was justified by Tufail's misrepresentation," stating that Tufail's representation that "no zoning laws restricting [Midwest Hospitality's] operation of a Church's Chicken fast-food restaurant on the leased premises" was "false from the moment the parties signed the lease." Id., ¶¶1, 9.

¶21 The court of appeals rejected Tufail's argument that he did not make a false representation because the lease does not set forth a use as a fast-food restaurant with a drive-through. Id., ¶8. It concluded that by reference to "Church's Chicken," Paragraph 5 of the lease "allowed the operation as a Church's Chicken" and that it was "not necessary for the use provision in the lease to include additional words allowing operation of a fast-food restaurant. A Church's Chicken is a fast-food restaurant." Id.

II

¶22 This case requires us to determine whether Tufail breached the lease, a written contract, by making a false representation. The interpretation of a contract presents a

question of law, which we determine independently of the conclusions rendered by the circuit court and the court of appeals. Ehlinger v. Hauser, 2010 WI 54, ¶47, 325 Wis. 2d 287, ¶47, 785 N.W.2d 328.

¶23 Here, the circuit court presided over a three-day bench trial and made findings of fact. We accept the circuit court's findings of fact unless they are clearly erroneous. Phelps v. Physicians Ins. Co. of Wisconsin, Inc., 2009 WI 74, ¶34, 319 Wis. 2d 1, 768 N.W.2d 615.

### III

¶24 The sole question presented on review is whether Tufail breached the lease by making a false representation. The lease is a written contract and our analysis is controlled entirely by well-established canons of contract interpretation. Accordingly, as a preface to addressing the question presented, it is helpful to review those basic principles of contract interpretation relevant to the issue before us.

¶25 Contract interpretation generally seeks to give effect to the parties' intentions. Seitzinger v. Community Health Network, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426. However, "subjective intent is not the be-all and end-all." Kernz v. J.L. French Corp., 2003 WI App 140, ¶9, 266 Wis. 2d 124, 667 N.W.2d 751. Rather, "unambiguous contract language controls contract interpretation." Id.

¶26 Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal

terms.    Maryland Arms Ltd. Partnership v. Connell, 2010 WI 64, ¶23, 326 Wis. 2d 300, 786 N.W.2d 15 (quoting Gorton v. Hostak, Henzl & Bichler, S.C., 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998)).    "We presume the parties' intent is evidenced by the words they chose, if those words are unambiguous."    Kernz, 266 Wis. 2d 124, ¶9.

¶27    If the terms of the contract are ambiguous, evidence extrinsic to the contract itself may be used to determine the parties' intent.    Seitzinger, 270 Wis. 2d 1, ¶22.    "A contract provision is ambiguous if it is fairly susceptible of more than one construction."    Mgm't Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996).

¶28    Contract language is construed according to its plain or ordinary meaning, Huml v. Vlazny, 2006 WI 87, ¶52, 293 Wis. 2d 169, 716 N.W.2d 807, consistent with "what a reasonable person would understand the words to mean under the circumstances."    Seitzinger, 270 Wis. 2d 1, ¶22.    For a business contract, that is "the manner that it would be understood by persons in the business to which the contract relates." Columbia Propane, L.P. v. Wisconsin Gas Co., 2003 WI 38, ¶12, 261 Wis. 2d 70, 661 N.W.2d 776.

¶29    The court construes contracts "as they are written." Id., ¶12.    Ultimately, "the office of judicial construction is not to make contracts . . . but to determine what the parties contracted to do."    Marion v. Orson's Camera Centers, Inc., 29 Wis. 2d 339, 345, 138 N.W.2d 733 (1966) (quoting Wisconsin

*Marine & Fire Ins. Co. Bank v. Wilkin*, 95 Wis. 111, 115, 69 N.W. 354 (1897).

¶30 Additionally, as this court recently stated, courts may not consider evidence of prior or contemporaneous oral or written agreements between the parties if a contract is fully integrated:

> A contract that represents the final and complete expression of the parties' agreement is considered fully "integrated." If the contract is integrated, absent the existence of fraud, duress, or mutual mistake, the court construing the contract may not consider evidence of any prior or contemporaneous oral or written agreement between the parties.

*Town Bank v. City Real Estate Development, LLC*, 2010 WI 134, ¶37, 330 Wis. 2d 340, 793 N.W.2d 476. If a contract contains "an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration." *Id.*, ¶39; *Peterson v. Cornerstone Property Development, LLC*, 2006 WI App 132, ¶31, 294 Wis. 2d 800, 720 N.W.2d 716 (quoting *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 608-09 n.11, 407 N.W.2d 873 (1987)) (courts may not consider extrinsic evidence to "vary or contradict the terms of a writing" when the contract is fully integrated).

¶31 In this case, as quoted above, the lease at issue contains an integration clause. It states that the entire agreement between the parties has been reduced to writing. It plainly states without qualification that "all" of the understandings between the parties are set forth in the lease

and any attached exhibits, riders, or addendums.  Therefore, we are guided by the text of the lease, not by any extrinsic, unwritten understandings that may have existed between the parties.[7]  Id.; Peterson, 294 Wis. 2d 800, ¶31 (quoting Ziegler Co., 139 Wis. 2d at 608-09 n.11).

¶32 Having reviewed the relevant canons of contract interpretation, we turn now to address the question of whether Tufail breached the lease by making a false representation.  Our inquiry hinges first on the meaning of Tufail's representation as it is written in the lease, and second, on whether the representation is false under the facts of this case.  The representation states as follows:

Landlord represents and warrants to Tenant that:

. . . .

---

[7] Contrary to the unambiguous integration clause, Midwest Hospitality urges us to consider the parties' unwritten "understanding of Church's Chicken" as a fast-food restaurant. It contends that "Church's Chicken was understood to be a fast-food restaurant by all parties," and that understanding is "inherent in interpreting [the lease's references to] 'Church's Chicken' . . . regardless of the absence of 'fast-food' in the Use of Premises provision."  In effect, it contends that "there is no such thing" as a sit-down Church's Chicken restaurant.

Here, however, the parties have expressly stated that "[t]his Lease . . . set[s] forth all the . . . understandings by and between the Landlord and Tenant concerning the Premises." In light of the parties' unambiguous statement that no additional understandings existed between them concerning the lease, we decline to consider Midwest Hospitality's "understanding of Church's Chicken" as a particular type of fast-food restaurant when such an understanding is not presented in the text of the lease.

(g) no existing restrictions, building and zoning ordinances, or other laws or requirements of any governmental authority prevent the use of the Premises for the purposes set forth in Paragraph 5 . . . .

Paragraph 5 of the lease, in turn, provides that:

5.   Use of Premises.   Tenant may use and occupy the Premises for any lawful purpose, including, but not limited to, the retail sales, consumption, and delivery of food and beverages which shall include, but not be limited to, Chicken products, Fish products, bread products, salads, sandwiches, dessert items, promotional items, and any other items sold by any Church's Chicken store.

¶33 Tufail acknowledges that the lease unambiguously provides that Midwest Hospitality may not be prevented from using the property for certain specified purposes.  He advances, however, that a fast-food restaurant with a drive-through is not among the "purposes set forth in Paragraph 5."  Furthermore, he asserts that all of the uses identified in Paragraph 5 are permitted uses of the premises under the City of Milwaukee zoning code.  Given that the City of Milwaukee granted a special use permit allowing the operation of a Church's Chicken restaurant, including the operation of a Church's Chicken fast-food restaurant with a drive-through, he contends that the representation was not false.

¶34 Midwest Hospitality likewise acknowledges the unambiguous text of the lease, but further argues that the lease

14

incorporates the fact that "Church's Chicken was understood to be a fast-food restaurant by all parties."[8]

¶35 We construe the contract as it is clearly written. Midwest Hospitality may not be prevented from using the property for the purposes specifically identified in Paragraph 5. Paragraph 5 then identifies the various products which may be consumed, sold, distributed, or otherwise used on the property.

¶36 Among the products identified in Paragraph 5 is counted "any other items sold by any Church's Chicken store." Midwest Hospitality argues, and the court of appeals concluded, that the reference to a "Church's Chicken" in Paragraph 5 requires that a Church's Chicken fast-food restaurant with a drive-through may be operated on the property. We reject that argument.

---

[8] Tufail states in his brief that "[t]he lease is unambiguous," while Midwest Hospitality argues that Tufail "unambiguously warranted that there were no zoning restrictions preventing . . . the contemplated use of the Property." Their respective "unambiguous" constructions of the lease diverge greatly in scope.

That the parties have construed the representation differently does not alone render it ambiguous. Ambiguity is found where a contract "is fairly susceptible of more than one construction," not necessarily where different constructions are argued. Mgm't Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). We must interpret the lease "as it stands, even though the parties may have placed a different construction on it." Cernohorsky v. Northern Liquid Gas Co., 268 Wis. 586, 593, 68 N.W.2d 429 (1955); see also Brew City Redevelopment Group, LLC v. The Ferchill Group, 2006 WI App 39, ¶3, 289 Wis. 2d 795, 714 N.W.2d 582.

¶37 A mere reference to products used by a "Church's Chicken store" does not represent that Midwest Hospitality may operate a Church's Chicken fast-food restaurant with a drive-through.  The lease plainly provides that Midwest Hospitality may not be prevented from using the property for certain, specified purposes.  Notably absent from that list is any requirement that the property may be used as a fast-food restaurant with a drive-through.[9]

¶38 Accordingly, we conclude that Tufail's representation requires simply that Midwest Hospitality may not be prevented from using the property for the purposes specifically identified in Paragraph 5.  Having ascertained the plain meaning of the representation, all that remains is to determine whether the representation is false under these facts.

---

[9] Likewise, the lease does not set forth any requirements regarding the conditions specified in the special use permit relating to the hours of operation or the time period in which any permit must be renewed.  Despite the lack of reference to a fast-food restaurant or to the conditions set forth in the special use permit, the dissent interprets the lease to mean that Tufail "warrant[ied] that there were no zoning requirements with which Midwest had to comply in order to sell Church's Chicken products in a fast-food restaurant."  Dissent, ¶78; see also dissent, ¶¶94, 101.

In relying on words that cannot be found in the lease, the dissent appears to rewrite it.  The representation in the lease simply states that no existing restrictions, building and zoning ordinances, or other laws or requirements prevent Midwest Hospitality from using the property for the purposes identified in Paragraph 5.  It focuses on whether Midwest Hospitality is prevented from using the property for certain purposes, not on whether Midwest Hospitality had to comply with various governmental regulations.

16

¶39 In this case, the circuit court made extensive findings of fact at the conclusion of a three-day bench trial. It found that "[t]he vast majority of Church's Chicken restaurants have drive-through operations, but not all." There was "no evidence" showing that Tufail knew about the many other Church's Chicken restaurants, whether or not they had drive-through operations, or about Church's Chicken franchise requirements such as closing times.

¶40 The circuit court also found that the parties "entered into a written lease in March of 2008," which was, by its own terms, to last for a five-year period. After the lease was signed and Midwest Hospitality took occupancy, it discovered that a special use permit was required from the City of Milwaukee "so that it could have a drive-through as part of the restaurant."

¶41 Furthermore, the circuit court found that "Midwest Hospitality's application for a special use permit to use the subject property for a fast food restaurant with a drive-through was approved by the City of Milwaukee." Although it observed that the approval "was not exactly as Midwest Hospitality may have wanted" due to the conditions in the special use permit, it found that Midwest Hospitality was not prevented, "in any way, [] from opening a Church's Chicken restaurant at the subject property." The special use permit allowed operation "with a drive-through and as a fast food restaurant":

> But the special use permit as approved by the City of Milwaukee did not prevent, in any way, Midwest

17

Hospitality from opening a Church's Chicken restaurant at the subject property with a drive-through and as a fast food restaurant. Therefore, the Court finds that even if the subject lease was interpreted to include as an intended use a fast food restaurant with a drive-through, that intended use was allowed by the City of Milwaukee. The representations and warranties of Mr. Tufail contained in the lease itself are for the intended use as specifically set forth in the lease in paragraph five, and there was no evidence presented that those representations and warranties were not true.

Accordingly, the circuit court determined that "the claim that Mr. Tufail made misrepresentations was not established."

¶42 No one argues that the findings of the circuit court, to the extent that they set forth the dispositive facts of this case, are clearly erroneous. Phelps, 319 Wis. 2d 1, ¶34. We likewise see no indication that its findings are clearly erroneous. Therefore, we are bound to accept those findings, including the circuit court's finding that Midwest Hospitality was not in fact prevented from opening a Church's Chicken restaurant at the subject property.

¶43 Given the lack of any reference in the lease to a fast-food restaurant with a drive-through, there is no indication in the facts that the uses of the property, as they are stated in Paragraph 5 of the lease, were prevented. There is no indication that any of the uses specified in Paragraph 5 cannot be performed at a sit-down restaurant, which is a permitted use under the City of Milwaukee zoning code. Rather, the fact that Midwest Hospitality was granted a special use permit specifically allowing use of the property as a Church's Chicken restaurant soundly refutes the premise that Midwest

18

Hospitality was prevented from using the property for any of the purposes stated in Paragraph 5.

¶44 We further observe that even if we accepted Midwest Hospitality's argument that there is an "undisputed understanding of Church's Chicken" as a fast-food restaurant with a drive-through and that the representation incorporates that "undisputed understanding," the representation is still not false under these facts. The circuit court expressly found that when the special use permit was granted by the City of Milwaukee, Midwest Hospitality was allowed to operate a Church's Chicken fast-food restaurant with a drive-through.

¶45 The facts of this case indicate that although Midwest Hospitality was not prevented from using the property for the purposes identified in Paragraph 5 of the lease, those purposes alone did not necessarily ensure that the proposed Church's Chicken restaurant was worth Midwest Hospitality's investment. However, as the circuit court observed, "[t]here was nothing to prevent Midwest Hospitality from putting contingencies in the lease about hours of operation, a drive-through or anything else deemed necessary. It did not." We interpret only the contract to which the parties agreed. Marion, 29 Wis. 2d at 345.

¶46 Ultimately, the result of this case is compelled by basic principles of contract interpretation and by the circuit court's findings of fact following a three-day bench trial. Tufail explicitly represented in paragraph 33 of the lease that

19

Midwest Hospitality would not be prevented from using the property for the listed purposes.

¶47 The circuit court found that there was no evidence to support the argument that the representations were untrue. Additionally, it found that Midwest Hospitality was not prevented "in any way" from opening a Church's Chicken restaurant at the leased property.

- "The representations and warranties of Mr. Tufail contained in the lease itself are for the intended use as specifically set forth in the lease in paragraph five, and there was no evidence presented that those representations and warranties were not true."

- "[T]he special use permit as approved by the City of Milwaukee did not prevent, in any way, Midwest Hospitality from opening a Church's Chicken restaurant at the subject property with a drive-through and as a fast food restaurant."

¶48 Importantly, the circuit court specifically found that even if the lease was interpreted to include uses not explicitly listed in its terms——uses as a fast-food restaurant with a drive-through——that the evidence showed that such uses were not prevented.

- "Therefore, the Court finds that even if the subject lease was interpreted to include as an intended use a fast food restaurant with a drive-through, that intended use was allowed by the City of Milwaukee."

20

¶49 There has been no showing that the circuit court's dispositive findings of fact are clearly erroneous.  No party has even attempted to advance such an argument.  Accordingly, we conclude that Tufail did not breach the lease by making a false representation.

IV

¶50  In sum, we conclude that the representation does not include any use of the property as a Church's Chicken fast-food restaurant with a drive-through.  Additionally, there is no indication that any of the uses identified in the lease were prevented under the City of Milwaukee zoning code.

¶51  We further conclude that the representation was not false because the circuit court found that Midwest Hospitality was not prevented from using the property for the uses specified in the lease, and its finding is not clearly erroneous.  Therefore, Tufail did not breach the lease.  Accordingly, we reverse the court of appeals and remand, and the judgment of the circuit court is thereby affirmed.

*By the Court.*—The decision of the court of appeals is reversed and remanded.  The judgment of the circuit court is thereby affirmed.

¶52 DAVID T. PROSSER, J. *(dissenting)*. Amjad Tufail (Tufail) and Midwest Hospitality, LLC (Midwest) entered into a lease in which Tufail unambiguously warranted that there were no local ordinances that would prevent Midwest from operating a fast-food Church's Chicken restaurant on Tufail's property. The majority opinion concludes that Tufail did not breach this warranty because the lease did not define "Church's Chicken" as a fast-food restaurant. However, the only reasonable meaning of "Church's Chicken" is a fast-food restaurant.

¶53 Even if the lease were deemed ambiguous, the extrinsic evidence demonstrates that Church's Chicken is a fast-food restaurant, and both parties were aware of that fact when they signed the lease. Tufail's warranty that no ordinances prevented the operation of a Church's Chicken was false because the Milwaukee zoning code requires any freestanding fast-food restaurant to have a special use permit. Therefore, Tufail breached the lease.

¶54 The majority opinion employs a sterile, technical interpretation of the lease that abandons the basic principles of contract interpretation. When interpreting a contract, the court's goal has always been to effect the intent of the parties as it is expressed in the language of the contract. The importance of upholding this principle cannot be overstated because people in business use contracts to try to minimize uncertainty in relation to their reasonable expectations.

¶55 Parties generally enter agreements to advance their economic interests. Risks, of course, are inevitable. But if

1

one party is able to frustrate the basic purpose of a contract through an unreasonable interpretation of its terms and commitments, instability will follow, and we will be left with a system of law that rewards the more cunning party and disregards mutual intent. Because the majority opinion supports an implausible interpretation of the lease contract in this case, I must respectfully dissent.

I

¶56 In 2000 Tufail purchased a property with a freestanding building located at 1635 West North Avenue (the Property) in Milwaukee. The Property was operated as a New York Chicken fast-food restaurant, and Tufail continued that operation until the fall of 2007. The Property had formerly been a Church's Chicken. In fact, Tufail later testified that "it was an old design Church's Chicken which [he] was running." Tufail was not inexperienced in the restaurant business; he owned four other restaurants.

¶57 When he acquired the Property in 2000, Tufail wanted to continue operating the fast-food restaurant. His request was denied by a city plan examiner. Tufail was told that a fast-food restaurant was a special use under the zoning code and he would need to obtain a special use permit. He eventually acquired a ten-year special use permit from the Milwaukee Board of Zoning Appeals (BOZA). When Tufail temporarily closed the restaurant in or about October of 2007, he had approximately three years left on his ten-year special use permit before it would have to be renewed.

2

¶58 Midwest approached Tufail about opening a Church's Chicken restaurant at the Property both before and after Tufail shut down operation of his New York Chicken. Midwest is a corporate entity that operates Church's Chicken restaurants and is owned by Aslam Khan (Khan). Munshi Ali, a Church's Chicken manager at a different location, approached Tufail four or five times and stated that Khan wanted to lease Tufail's property to operate a Church's Chicken. Khan himself eventually visited the Property with several other people affiliated with Church's Chicken. Khan stated that he owned many Church's Chicken restaurants in the Midwest and said that Tufail's property value would go up if Church's Chicken moved in.

¶59 Two or three days after Khan visited the Property, Khan sent an agent, Tariq Malik (Malik), to Tufail with a lease drafted by Midwest. Malik and Tufail went to Tufail's attorney, who made some changes to the lease. However, the attorney did not alter Paragraph 5, which contained the provisions regarding the use of the premises. At some point before he signed the lease, Tufail visited a Church's Chicken at another location to see how Midwest would alter the Property.

¶60 Tufail and Midwest entered into a five-year lease (the Lease) for the Property in March 2008. The "Use of Premises" section in Paragraph 5 of the Lease stated:

> Tenant may use and occupy the Premises for any lawful purpose, including, but not limited to, the retail sales, consumption, and delivery of food and beverages which shall include, but not be limited to, Chicken products, Fish products, bread products, salads, sandwiches, dessert items, promotional items,

3

and any other items sold by any Church's Chicken store.

¶61 The "Representations and Warranties" section of the Lease, in Paragraph 33(g), stated that the landlord represents and warrants that "no existing restrictions, building and zoning ordinances, or other laws or requirements of any governmental authority prevent the use of the Premises for the purposes set forth in Paragraph 5."

¶62 The Lease also stated at the end of the "Representations and Warranties" section that the representations and warranties "are material ones, and Landlord accordingly agrees that any misrepresentation or breach of such warranty will be reason for Tenant to terminate this Lease."

¶63 Regarding interpretation of these provisions, Paragraph 38 of the Lease said, "This Lease shall be interpreted to the broadest extent possible to give <u>full and fair meaning to the intentions of the parties hereto</u>." (Emphasis added.)

¶64 Midwest entered the Property and began remodeling it in May 2008. According to Midwest, the Property required a substantial amount of cleaning and repair work. However, Midwest suspended the renovation when it was denied a building permit.

¶65 When Midwest applied for that permit, it was told that it would have to apply for a special use permit to operate a fast-food restaurant in a freestanding building. The examiner for the City, Barbara Jones, stated in her denial letter that the Milwaukee zoning code did not allow the Property to be used as a fast-food restaurant. Thus, Midwest unexpectedly learned

4

that it was faced with the same obstacles with zoning ordinances that Tufail had faced roughly eight years earlier. What Midwest did not know was that Tufail's business had been cited for 21 health code violations by the city in 2007 and had antagonized a lot of nearby residents.

¶66 On May 29, 2008, Midwest applied for a special use permit to operate a fast-food restaurant with a drive-through within 150 feet of residential property. Four sections of the City of Milwaukee zoning code were in play. Section 295-203-9.f. defines a sit-down restaurant as:

> a restaurant where the food or beverages sold are consumed at tables located on the premises, where taking food or beverages from the premises is purely incidental, where food or beverages are normally served utilizing nondisposable containers and utensils and where the consumption of food or beverages in vehicles on the premises in which the building is located does not regularly occur, or where the restaurant is located within a building containing more than one principal use other than another restaurant. This term does not include a tavern.

¶67 Section 295-203-9.g. defines a fast-food or carry-out restaurant as "a restaurant other than a sit-down restaurant where the manner of preparation, packaging and serving of food or beverages encourages their consumption outside the building. This term does not include a tavern." Section 295-603-2.o. requires that a fast-food restaurant be in a building containing at least one permitted use, or the restaurant must get a special use permit. Finally, Section 295-603-2.j.3. states that a drive-through may not be located within 150 feet of residential property.

5

¶68 Midwest's intended use of the Property was inconsistent with the definition of a sit-down restaurant. The city immediately recognized that Church's Chicken, like the prior New York Chicken, is a fast-food restaurant and it would likely expect to use the existing drive-through. Thus, without a special use permit, operating a Church's Chicken on the Property would violate two separate zoning code provisions: the prohibition against operating a freestanding fast-food restaurant and the prohibition against having a drive-through within 150 feet of residential property.

¶69 In September 2008, approximately six months after it signed the Lease, Midwest obtained a special use permit to operate the restaurant. However, the city imposed very different conditions on Midwest from the conditions it had imposed on Tufail. Tufail obtained a ten-year permit; Midwest received a one-year permit with no assurance of renewal. Tufail was permitted to operate until 4:00 a.m. Midwest could operate its Church's Chicken until only 9:00 p.m. The city's permit also required Church's Chicken to pick up all garbage within a one-block radius of the Property. The president of Falcon Holdings, which operates Midwest, testified that it would be too expensive to take care of all the garbage within a block of the Property and that a Church's Chicken would be less profitable if it had to close at 9:00 p.m.

¶70 The BOZA chairman stated that Midwest faced a difficult decision whether to invest "hundreds of thousands of dollars for a one year approval by this board. There is no

6

guarantee of an approval after one year." The local community appeared to share the chairman's concern, and many city residents opposed the special use permit.

¶71 Due to the long delay in obtaining any special use permit and then the severe restrictions added to the permit, Midwest stopped paying rent.

II

¶72 The plain language of the Lease unambiguously demonstrates that the parties intended for Midwest to operate a Church's Chicken fast-food restaurant on the Property. The court's goal in contract interpretation is to discern the intentions of the parties as expressed in the language of the contract. Town Bank v. City Real Estate Dev., LLC, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476. The court will look at the ordinary meaning of the contractual language, and if it is unambiguous, the contractual interpretation remains within the four corners of the contract. Id. A contract is ambiguous when "it is susceptible to more than one reasonable interpretation." Id.

¶73 The broad language in the Lease unambiguously suggests that Midwest could have operated almost any lawful business on the Property. Paragraph 5 of the Lease states that "Tenant may use and occupy the Premises for any lawful purpose . . . ." It was not unreasonable for Midwest to assume that it could operate a freestanding fast-food restaurant because that is a seemingly lawful purpose and because New York Chicken had operated on the property in that manner. Moreover, the Lease quickly narrows

7

its intent by adding the words "including . . . the retail sales, consumption, and delivery of food and beverages." Then the Lease pinpoints its objective by naming "Chicken products, Fish products, bread products, salads, sandwiches, dessert items, promotional items, and any other items sold by any Church's Chicken store." (Emphasis added.)

¶74 The Lease in this case is unambiguous because it uses "Church's Chicken" according to its ordinary meaning: a fast-food restaurant.[1] The Lease states that Midwest may use the Property for "retail sales, consumption, and delivery of food and beverages which shall include . . . Chicken products . . . and any other items sold by any Church's Chicken store."

¶75 Courts must interpret a contract "in the manner that it would be understood by persons in the business to which the contract relates." Columbia Propane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶12, 261 Wis. 2d 70, 661 N.W.2d 776.[2] In the restaurant business, "Church's Chicken is a highly recognized brand name in the Quick Service Restaurant sector and is one of the largest quick-service chicken concepts in the [w]orld." Church's Chicken Celebrates Its Southern Hospitality with Kick Off of New

---

[1] Interestingly, the first Church's Chicken restaurant was called "Church's Fried Chicken-To-Go." One Man, One Chicken Legacy, Churchs.com, http://www.churchs.com/about.html (last visited June 25, 2013). Church's Chicken has always been a fast-food restaurant.

[2] See also N. Gate Corp. v. Nat'l Food Stores, 30 Wis. 2d 317, 321, 140 N.W.2d 744 (1966); All-Star Ins. Corp. v. APS Ins. Agency, Inc., 112 Wis. 2d 329, 333, 332 N.W.2d 828 (Ct. App. 1983); 17A Am. Jur. 2d Contracts § 337 (2004).

*Advertising Campaign*, (Nov. 3, 2011), http://www.businesswire.com/news/home/20111103005028/en/Church%E 2%80%99s-Chicken-Celebrates-Southern-Hospitality-Kick-Advertising. Because of Church's Chicken's "highly recognized brand name," the court of appeals had no trouble asserting that, "[i]t is undisputed here that a Church's Chicken is a fast-food restaurant. It was not necessary for the use provision in the lease to include additional words allowing operation of a fast-food restaurant. A Church's Chicken is a fast-food restaurant." *Tufail v. Midwest Hospitality, LLC*, No. 2011AP1451, unpublished slip op., ¶8 (Wis. Ct. App. Aug. 1, 2012).

¶76 Even though Tufail is correct that not <u>everyone</u> would understand what a Church's Chicken is, its reputation in the restaurant industry demonstrates that those in the business would know that it is a fast-food restaurant.[3] Since the only reasonable meaning of "Church's Chicken" is a fast-food chicken restaurant, a paragraph that allows for the sale of "items sold by any Church's Chicken store" unambiguously contemplates the operation of the Property as a fast-food restaurant.

¶77 Furthermore, the Lease explicitly calls for broad interpretation to avoid an unfair reading of the contract and to "give full and fair meaning to the intentions of the parties." It would not be reasonable to define "Church's Chicken" in a way that contradicts its true definition. Midwest persuasively argues that "Church's Chicken" must refer to a fast-food

---

[3] At trial, Tufail's own expert understood that a Church's Chicken is a fast-food restaurant and that Midwest intended to operate a freestanding Church's Chicken on the Property.

restaurant because <u>all</u> Church's Chicken restaurants are fast-food restaurants. Since the zoning code did not permit a fast-food restaurant on the Property and Church's Chicken is a fast-food restaurant, Tufail's warranty that no ordinances prevented the operation of a Church's Chicken on the Property was false.[4]

¶78 The problem with Tufail's warranty is apparent when compared to another Lease provision. Paragraph 24(b) says, "If allowed by local governmental authorities, Tenant shall have the right to erect and maintain exterior free standing sign(s) in the location set forth on Exhibit 'A'. Landlord agrees to cooperate fully with Tenant in obtaining all required governmental permits, licenses, approvals and variances for Tenant's sign(s)." This paragraph is clear that the tenant might need to get government permits or variances in order to erect the desired signage. In contrast, Paragraph 33(g) provides a broad warranty that there are no "requirements of any governmental authority" that would prevent the tenant from using the Property as specified in Paragraph 5. Tufail was not forced to embrace the broad warranty in Paragraph 33(g). He could have made a qualified commitment as appears in Paragraph 24(b), or he could have forthrightly disclosed the zoning regulations and made the Lease contingent upon receipt of a satisfactory special

---

[4] The majority opinion observes that the circuit court made a finding of fact that not all Church's Chicken restaurants have a drive-through. Majority op., ¶39. However, the drive-through issue is a red herring. Church's Chicken is undeniably a fast-food restaurant chain. The zoning code prohibited the operation of a freestanding fast-food restaurant regardless of whether that restaurant had a drive-through. Tufail warranted against that obstacle.

use permit. However, because Tufail warranted that there were no zoning requirements with which Midwest had to comply in order to sell Church's Chicken products in a fast-food restaurant, Tufail must be held to his promise.

III

¶79 Tufail's warranty that no restrictions prevent the operation of a Church's Chicken is unambiguous, but even if "Church's Chicken" is deemed ambiguous, the parol evidence demonstrates that the parties understood Church's Chicken to be a fast-food restaurant. If a contract is ambiguous, the court may use parol evidence to explain the ambiguous term. Town Bank, 330 Wis. 2d 340, ¶38. Tufail admitted that "[t]he intended purpose of the Lease, as represented by Midwest, was for it to open a new Church's Chicken restaurant at the Leased Premises." Tufail had to know that Church's Chicken is a fast-food restaurant because his New York Chicken restaurant was an old Church's Chicken. Furthermore, Tufail saw that Church's Chicken is a fast-food restaurant when he visited one before signing the Lease.

¶80 Tufail's visit is important because the parties' course of dealings can clarify contractual ambiguities. See Martinson v. Brooks Equip. Leasing, Inc., 36 Wis. 2d 209, 219, 152 N.W.2d 849 (1967). In Martinson, the contract for the construction of a pool was ambiguous because it incorporated plans for a pool but did not explicitly incorporate plans for a filter system. Id. at 218-19. However, the evidence showed that the appellant knew that the filter system was part of the

11

plans for the pool. Id. Furthermore, because the plans for the pool included the plans for the filter system and the contractor used a single set of plans to construct both, the plans for the filter system were part of the contract. Id. at 219-20. The course of dealings in the present case demonstrates that Tufail knew what the term "Church's Chicken" meant. He had visited another Church's Chicken fast-food restaurant to see how Midwest would alter the Property. This visit shows that the parties knew and intended that Midwest would operate a fast-food restaurant on the Property.

¶81 Tufail's interpretation of the Lease is also suspect because it would render the inclusion of "Church's Chicken" meaningless, and courts avoid interpreting contracts to make portions superfluous. See DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship, 2004 WI 92, ¶44, 273 Wis. 2d 577, 682 N.W.2d 839. In DeWitt, a law firm provided services to Galaxy under a contract that charged interest on untimely payments, but Galaxy had no assets or income. Id., ¶7. Galaxy's owner guaranteed full payment, but the guaranty was silent as to whether the owner would pay interest. Id., ¶43. It would have been meaningless to include the interest clause in the contract with Galaxy, a company with no assets, unless the owner's guaranty for full payment included a guaranty to pay the interest. Id., ¶¶46-47. Similarly, it would make little sense for the Lease to mention "Church's Chicken" four times if that term could refer to any type of restaurant. Tufail seems to suggest that since the Lease does not explicitly define

12

"Church's Chicken," no warranty would be violated if a Church's Chicken could open and operate under any circumstance.  However, the "Church's Chicken" term is useful only if it refers to the Church's Chicken fast-food restaurants that actually exist.

IV

¶82 After a trial, the circuit court ruled in favor of Tufail.  In so doing, the court appears to have overlooked or discounted critical testimony, minimized the fast-food zoning problem to focus on the drive-through, shifted the blame to Midwest for failing to engage in due diligence, and disregarded an explicit provision in the Lease.

¶83 From the outset, Midwest sought to lease Tufail's property to open and operate a Church's Chicken fast-food restaurant.  Paragraph 33(g) of the Lease was designed to minimize the hazard of an existing zoning barrier against the operation of a traditional Church's Chicken restaurant and to provide an escape clause from a five-year lease if an existing barrier unexpectedly materialized.  Midwest no doubt wanted a drive-through which is often, if not always, a component of a fast-food restaurant.  If a drive-through were the sole or major sticking point, the specific representations in the Lease might present a different case.

¶84 The circuit court recast the facts and narrowed the issue.  The circuit court found that "there was no evidence presented that Tufail knew about the many other Church's Chicken restaurants, whether or not they had drive-through operations or other Church's Chicken franchise requirements."

13

¶85 In my view, the statement about Tufail's knowledge is clearly erroneous, and the court's emphasis on the drive-through problem fails to deal with Midwest's legal argument that there were two zoning problems they had to face, contrary to Tufail's warranty.

¶86 As to his knowledge, Tufail testified that the restaurant he bought in 2000 was a drive-through and carry-out fast-food restaurant:

> Q    All right.    And when you bought [the Property], was it an ongoing restaurant?
>
> A    It was a running restaurant.    It was a chicken place.
>
> Q    What was the name of it then?
>
> A    At that time it was a New York Chicken.  But basically it was a Church's Chicken place closed down. And the [previous owner], he bought it from Church's Chicken and put the name—— They didn't let him use their Church's Chicken.  They——  So he put a New York Chicken [there].

(Emphasis added.)

¶87 Tufail acknowledged that "it was an old design Church's Chicken which [he] was running."  (Emphasis added.)  He said that he used Church's Chicken equipment in his New York Chicken and suggested that Church's Chicken use the same equipment for its new operation.    Tufail visited another Church's Chicken in Milwaukee, and he discussed the new interior and exterior alterations that Midwest intended to make.    He expected that Midwest would make his property look like other Church's Chicken restaurants.    He testified that the purpose of

the Lease "as it was presented by Midwest [was] to open a new Church's Chicken restaurant at the leased premises."

¶88 In March 2007, before the Lease was fully negotiated and signed, Tufail was visited by Khan who oversees more than 100 Church's Chicken franchises in the Midwest. The circuit court and the majority appear to believe that Khan and Tufail never discussed what a Church's Chicken restaurant is all about, so that Tufail really did not know. This view of the facts is unrealistic if not incredible and is directly contrary to Tufail's acknowledgment at trial that he understood Midwest could not operate the Property without a special use permit.

¶89 In short, the court's finding that Tufail knew nothing about other Church's Chicken restaurants cannot be squared with the record.

¶90 The court made another questionable finding of fact. The court found that, "[i]n early 2008, after the [New York Chicken] restaurant had closed, Tufail was then approached by representatives of Midwest Hospitality who sought to lease the subject property." (Emphasis added.) Tufail's attorney, citing the record, writes in his brief: "Midwest had approached Tufail about opening a Church's Chicken restaurant at the location prior to and immediately after Tufail temporarily ceased operations of his chicken restaurant." (Emphasis added.) In short, Tufail's attorney corrected the circuit court's findings of fact.

15

¶91 The court of appeals——in its recitation of facts—— simply disregarded the circuit court's mistaken "findings" on both matters discussed above.

¶92 As noted, the circuit court found that "there was no evidence that Tufail knew . . . whether other Church's Chicken restaurants had drive-through operations." It also found that "the vast majority of Church's Chicken restaurants have drive-through operations, but not all." (Emphasis added.) The latter finding is correct, but it is seriously incomplete. The court made no finding that there was any Church's Chicken restaurant that was not a fast-food restaurant. The court also made no finding that there was any freestanding Church's Chicken that did not have a drive-through operation. More important for purposes of this case is that the Property had been operated as a freestanding fast-food restaurant and was intended by Midwest to be operated as a freestanding Church's Chicken fast-food restaurant. The point is that the Property's operation as a fast-food restaurant was not allowed by the Milwaukee zoning code without a special use permit. Tufail warranted otherwise.

¶93 Although the circuit court made sparse findings of fact about Church's Chicken restaurants, it made lengthy findings about Midwest's lack of due diligence. The court said:

> Brian Parrish is a commercial real estate broker who testified about industry custom and practice relating to commercial leases. Parrish testified that prior to entering into commercial leases parties routinely perform due diligence and described that as the period of time prior to the occupant taking occupancy to uncover any issues that they may encounter that would inhibit them from doing what they intend to do at that property, and that includes

16

government approvals, construction costs, financing, inspections. He further testified that any issues of import to the tenant[,] those items could have been a contingency, a due diligence item, in the lease. <u>Midwest Hospitality did not perform proper due diligence. In fact, Mr. Habash specifically testified that Midwest Hospitality didn't do any due diligence. He stated it was because of trust and assurances by Mr. Tufail</u>. But the Court does not find the testimony of Mr. Habash about reliance on Mr. Tufail credible. Mr. Habash is a senior executive at Midwest Hospitality who has been involved with the lease and renovation of many prior Church's Chicken restaurants. Mr. Habash is the president of the independent franchise council of over 750 such restaurants. Mr. Habash was at the subject property before entering into the lease and saw its poor condition. <u>It is not credible to believe that Mr. Habash relied upon statements of Mr. Tufail when making the decision of whether or not to have Midwest Hospitality enter into the subject lease</u>. Rather, it is more credible that Mr. Habash relied upon his own knowledge, experience, and personal inspection.

(Emphasis added.)

¶94 The circuit court's oral decision suggests that the court believed that Midwest should have thoroughly investigated all applicable zoning requirements before signing the Lease——that Paragraph 33(g) does not mean anything because Midwest should have previously discovered the requirements for a special use permit. These sentiments appear to substitute the court's expectations for the parties' intentions.

¶95 The majority opinion does not acknowledge the circuit court's reliance on "due diligence" as a justification for not enforcing the warranties in the Lease. This raises a very important issue of contract law.

¶96 This court has observed that, "in general, the laws in existence at the time of the contract are incorporated into that

17

contract." Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶60, 295 Wis. 2d 1, 719 N.W.2d 408 (citing Von Hoffman v. City of Quincy, 71 U.S. 535, 550 n.30 (1866)). The court of appeals has said: "It must be assumed that parties to a contract had knowledge of the law in effect at the time of the agreement." Krause v. Mass. Bay Ins. Co., 161 Wis. 2d 711, 718, 468 N.W.2d 755 (Ct. App. 1991) (citing Menard v. Sass, 127 Wis. 2d 397, 399, 379 N.W.2d 344 (Ct. App. 1985)).

¶97 Although these principles may be sound in general, parties seldom have equal knowledge of the law. One party cannot sign a contract assuring the other party that it will have no problems under existing law and then assert a due diligence defense when that assurance proves false. This axiom was eloquently stated in the English case of Redgrave v. Hurd:

> There is another proposition of law of very great importance which I think it is necessary for me to state, because, with great deference to the very learned Judge from whom this appeal comes, I think it is not quite accurately stated in his judgment. If a man is induced to enter into a contract by a false representation it is not a sufficient answer to him to say, "If you had used due diligence you would have found out that the statement was untrue. You had the means afforded you of discovering its falsity, and did not choose to avail yourself of them." I take it to be a settled doctrine of equity, not only as regards specific performance but also as regards rescission, that this is not an answer unless there is such delay as constitutes a defence under the Statute of Limitations.

Redgrave v. Hurd, [1881] 20 Ch.D. 1 at 13 (Eng.) (first emphasis added). One hundred years later, this ancient doctrine was embodied in our Restatement (Second) of Contracts, § 172 (1981): "A recipient's fault in not knowing or discovering the facts

18

before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing."

¶98 If the Supreme Court of Wisconsin intends to reject these principles, it ought to explain why. Rejection of these principles will certainly have implications for the enforcement of Wis. Stat. § 100.18, which was one of Midwest's counterclaims in this case.

¶99 One other item undermines the ruling of the circuit court. The court looked to Paragraph 5 of the Lease and said: "If Paragraph Five were vague or ambiguous in any way, the Court finds that the language contained therein was drafted by Midwest Hospitality and it should be construed against the drafter." This is directly contrary to Paragraph 36 of the Lease, which provides in part: "Landlord and Tenant have negotiated the terms of this Lease; therefore, this Lease shall not be interpreted or construed against or in favor of any party." (Emphasis added.)

¶100 In sum, the majority opinion heavily relies on the findings of fact and conclusions of law of the circuit court and completely rejects the well-considered decision of the court of appeals. This is a mistake of the first order.

V

¶101 The majority opinion also relies on the "integration clause" in the contract as precluding any consideration of parol evidence. This too is an error because the integration clause applies only to prior agreements. An integration clause "does not bar the use of extrinsic evidence to clarify the meaning of

19

an ambiguous text." Roth v. City of Glendale, 2000 WI 100, ¶49, 237 Wis. 2d 173, 614 N.W.2d 467 (Sykes, J., concurring) (quoting Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993)); see also Restatement (Second) of Contracts § 214 (extrinsic evidence is admissible to establish the meaning of a writing even if integrated).

¶102 If there is an integration clause, courts "may not consider evidence of any prior or contemporaneous oral or written agreement between the parties." Town Bank, 330 Wis. 2d 340, ¶37 (footnote omitted). In Town Bank, there was a commitment letter before the parties signed the contract, and the integration clause in the contract precluded consideration of the prior commitment letter. Id., ¶41. In the present case, there was no prior oral or written agreement regarding the Property or the definition of "Church's Chicken." If there were any ambiguity in the term "Church's Chicken," the integration clause would not prevent the use of extrinsic evidence to interpret that term in the Lease.

¶103 Even if the Lease were viewed as not specifying the operation of a Church's Chicken fast-food restaurant, the intent of the parties compels that interpretation. Paragraph 5 of the Lease allows for the use of the Property to sell items traditionally sold by any Church's Chicken. Items traditionally sold by Church's Chicken are fast-food items, and the only reasonable interpretation is that an establishment selling fast-food items is a fast-food establishment. Because the court's goal in construing a contract is to give effect to the parties'

20

intent, <u>Town Bank</u>, 330 Wis. 2d 340, ¶33, it is reasonable to interpret the inclusion of "Church's Chicken" to mean that Midwest could operate a Church's Chicken fast-food restaurant.

VI

¶104 The majority opinion leans upon the fact that Midwest ultimately attained a special use permit to operate a fast-food restaurant with a drive-through. This does not remedy Tufail's false warranty. The Lease warranted that there were no ordinances or restrictions preventing the uses specified in Paragraph 5. While Midwest obtained a one-year special use permit, that permit did not change the fact that operating a freestanding restaurant at the Property was not a permitted use. The city plan examiner denied Midwest's application to operate a Church's Chicken on the Property because the zoning code prevented such a use. Midwest could have terminated the Lease at that point, but it acted in good faith and worked hard to obtain a special use permit. Unfortunately, the excessive restrictions in the permit prevented Midwest from operating a Church's Chicken because the restrictions made it economically impracticable to do so.

¶105 Tufail had a permit to operate his New York Chicken from 10:00 a.m. to 4:00 a.m.——18 hours a day, seven days a week. Midwest received a permit that allowed it to operate until only 9:00 p.m., which likely was seven hours per day and 49 hours per week less than Tufail had operated. If the Church's Chicken restaurant were designed to open at 11:00 a.m., the restaurant would operate only ten hours per day. This completely scuttled

21

Midwest's business model for a restaurant located at the intersection of North Avenue and 17th Street in Milwaukee.

¶106 Moreover, the special use permit imposed another economic burden that prevented the operation of a Church's Chicken. The requirement that Midwest pick up garbage within a one-block radius of the Property was prohibitive. As the majority points out, a Midwest representative testified that the special use permit imposed restrictions that would have made the operation of a Church's Chicken "impossible." Majority op., ¶14. An economic impossibility is just as preventative as a physical or legal impossibility. The circuit court apparently failed to consider these insurmountable economic burdens when it stated that the special use permit "did not prevent, in any way, Midwest Hospitality from opening a Church's Chicken restaurant at the subject property with a drive-through and as a fast food restaurant." The special use permit's restrictions and uncertainty effectively prevented the operation of the Church's Chicken that the parties intended.

VII

¶107 When Tufail signed the Lease, he misrepresented that there were no ordinances that would prevent any use of the Property contemplated in Paragraph 5 of the Lease. Although the Lease did not define "Church's Chicken," the only meaning of that term is a fast-food restaurant. Even if "Church's Chicken" is ambiguous, the parol evidence demonstrates that both parties understood that a Church's Chicken is a fast-food restaurant. Since the Milwaukee zoning code states that a freestanding fast-

22

food restaurant is not a permitted use, Tufail breached his warranty.

¶108 For the foregoing reasons, I respectfully dissent.